IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 23, 2007 Session

## MEMPHIS LIGHT, GAS & WATER DIVISION
v.
## TOMMY CARL STARKEY

**An Appeal from the Circuit Court for Shelby County**
**No. CT-003082-03     Robert L. Childers, Judge**

_____

**No. W2006-01089-COA-R3-CV - Filed July 17, 2007**

_____

This case involves wrongful interference with an easement. The plaintiff utility operates an underground gas transmission line. The utility had an easement for the gas line, running along the north edge of a large tract of real property. For the gas line to operate safely, it needed sufficient soil both on top of the pipeline and on each side of the pipeline. The defendant developer acquired the real property, subject to the easement for the pipeline. The developer then sought to develop the real property. In May 2002, the defendant developer began excavating large amounts of dirt from within the easement site without proper authorization from the utility. Despite the utility's repeated demands to stop, the developer continued the excavation. Only when the utility threatened to have the developer arrested did he finally stop excavating dirt from around the pipeline. By this time, there was so little dirt surrounding the pipeline that there was serious danger to the public, and the utility was required to engage in immediate corrective work. The utility hauled in and spread 21,467 yards of dirt, restoring the easement site to a safe condition. The utility then filed suit against the developer, seeking compensatory and punitive damages. After a bench trial, the trial court awarded the utility compensatory damages and punitive damages. The defendant developer now appeals. We affirm, finding ample evidence to support the award of damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Stephen R. Leffler,[1] Memphis, Tennessee, for appellant, Tommy Carl Starkey.

William H. Haltom, Jr., and Stacie S. Winkler, Memphis, Tennessee, for appellee, Memphis Light, Gas & Water Division.

_____

[1]Mr. Leffler did not serve as trial counsel in the instant dispute.

**OPINION**

Plaintiff/Appellee Memphis Light, Gas & Water Division ("MLGW") is a public utility. MLGW maintains an underground gas transmission line that runs from Fayette County, Tennessee, all the way to Airways Road in the southern portion of Shelby County, Tennessee. The pipeline is quite large, measuring 24 inches in diameter. It is the highest pressure underground gas transmission line in Shelby County, operating under pressures of 650 to 800 pounds per square inch on a daily basis. The gas line serves a third of highly-populated Shelby County.

When this gas line was installed, MLGW obtained an easement along the north edge of a large tract of real property located at 5553 Hickory Hill Road. The easement is 75 feet wide; 50 feet along the north side of the gas line and 25 feet along the south side of it. The width of the easement allows room for construction and maintenance work along the gas main, and also acts as a "buffer" to ensure the safety of the general public in the event of a rupture or leak.

In addition, the easement facilitates two specific safety requirements for the pipeline. The first is the vertical "cover" for the pipeline, i.e., the amount of soil on top of it, to protect the line from damage and to prevent safety hazards. Federal regulations require that a pipeline buried in a location such as this be installed with a minimum "cover" of 36 inches. *See* 49 C.F.R. § 192.327. Because of the design of this particular gas transmission line, MLGW requires a minimum of 42 inches of vertical cover.[2] The second requirement facilitated by the easement is the lateral support or lateral "cover" for the pipeline, that is, the amount of ground support on each side of the gas line required to stabilize it. The easement at issue allows for at least 25 feet of lateral support on either side of the pipeline.

Several years after MLGW obtained the easement, Defendant/Appellant Tommy Carl Starkey ("Starkey") purchased the 5553 Hickory Hill Road property. Starkey is a licensed general contractor with 18 years' experience, and he purchased the property in order to develop it. In 2000, Starkey contacted MLGW's supervisor of gas engineering, Mike Bridges ("Bridges"), and asked him about the cost of relocating the underground gas transmission line. Starkey wanted the gas line relocated or lowered so that he could excavate dirt from within the easement site and move it to lower lying land. Bridges told Starkey that it would cost between $200,000 and $250,000 to relocate the gas line. In light of this, Starkey put his development plans on hold.

Two years later, in May 2002, Starkey contacted Bridges again. This time, Bridges assigned Steve Paschall ("Paschall"), a design engineer for MLGW, to work with Starkey. Starkey met with Paschall to discuss his general development plans for the property and to review the location of the gas line. Starkey gave Paschall a topographical map of the location. After the meeting, Paschall had measurements taken at the easement site to determine the depth of the gas line; these measurements indicated that parts of the gas line running through Starkey's property had roughly six to eight feet

---

[2]One of the purposes of vertical cover is to protect the gas line from "wheel-load," but the easement at issue was not designed as a thoroughfare or to withstand traffic from heavy equipment.

of vertical cover. Paschall and Starkey discussed these depth measurements on the telephone. However, Starkey and Paschall did not reach any agreement regarding development work on the easement site. Starkey did not obtain a permit for the excavation of soil within the easement.[3]

Despite the absence of any agreement with MLGW, in mid to late May 2002, Starkey hired a contractor and began excavating soil from the property and in particular from the easement along the pipeline. In early June 2002, MLGW learned that Starkey was excavating without authorization. After that, MLGW officials visited the site and found that Starkey had removed dirt from the vertical cover as well as from the lateral support on both sides of the gas line. The officials observed large tire marks in the dirt on top of the gas line, indicating that a heavy vehicle had been run over the gas line.

On approximately June 6, 2002, MLGW officials told Starkey to stop excavating. Starkey defiantly refused and maintained that he could do whatever he pleased with his property, including removing dirt from inside the easement. Starkey also told MLGW officials that, if the dirt were replaced, he would remove it again. After the MLGW officials left the site, Starkey directed his contractor to continue the excavation.

On June 10, 2002, MLGW sent a letter to Starkey. In the letter, MLGW informed Starkey that his excavation of soil in the easement had created an "unsafe and potentially dangerous" situation. MLGW outlined three possible plans of action to alleviate the danger Starkey's excavation had created: (1) Starkey could pay to have the gas main lowered, (2) restore 42 inches of vertical cover to the easement with the same elevation carried along the north and south easement lines at a three-to-one slope,[4] or (3) have MLGW crews restore the easement to its original condition and pay for all labor and machinery expenses. Starkey was told that he was required to respond to the letter by June 21, 2002. Starkey received this letter, but apparently ignored it and continued to remove dirt from the easement site. After that, MLGW brought law enforcement with them to the site and threatened to have Starkey arrested. At this point, Starkey ceased all work on the location.

Meanwhile, MLGW gas engineers determined that the easement site was dangerous and required immediate remedial work. As a result of Starkey's excavation, the pipeline sat above ground-level inside a "teepee"-like formation of dirt. To alleviate immediate hazard and create a safe working environment for the remedial work, MLGW shut down the gas line and released the gas inside it. MLGW then hired a third-party contractor to haul in and spread 21,467 yards of dirt at the easement site, restoring both the vertical and lateral cover for the gas pipeline.

---

[3]MLGW maintains an "Encroachment Policy" for the protection of its underground transmission lines. The policy requires a permit "for all excavating" within easement sites where underground gas transmission lines are located. MLGW also requires persons seeking to excavate within these easement sites to enter into an agreement under the policy.

[4]A three-to-one slope means that the lateral cover drops in grade, or elevation, one foot for every three feet it extends horizontally. The gradual slope prevents erosion and allows safe travel for vehicles and other equipment, such as tractors, to perform maintenance work at the easement site.

On May 30, 2003, MLGW filed suit against Starkey for interference with the use of its easement, seeking compensatory damages, punitive damages, and attorney's fees. MLGW alleged that Starkey willfully and intentionally interfered with its easement by "cut[ting] down" the elevation of the easement and removing dirt along the north and south sides of the gas line. MLGW also alleged that Starkey's actions created a dangerous situation that necessitated immediate remedial measures. In an answer filed on November 26, 2003, Starkey admitted that he removed dirt from within the easement site, but he denied that his actions were wrongful. Discovery ensued.

Subsequently, on April 7, 2005, MLGW filed a motion for partial summary judgment. Relying on affidavits from two of its witnesses and Starkey's deposition, MLGW asked the trial court to enter judgment on the issue of liability. This motion was denied. A bench trial was then held on April 17, 18, and 19, 2006.

At the outset of the trial, MLGW presented testimony from the MLGW design engineer, Steve Paschall. Paschall testified that when Starkey called in May 2002 for the initial depth measurements of the soil over the gas pipeline, he informed Starkey that "more work" needed to be done before any digging could begin. Paschall specifically recalled telling Starkey on at least two occasions that he did not have authority to remove dirt from the easement, and that any excavation required MLGW supervision. Paschall testified that Starkey was not given a copy of the MLGW encroachment policy or told about the permit process because MLGW was in the early phases of planning the relocation of the gas pipeline. Paschall said that he had created a preliminary design of the relocation and was waiting for Starkey to submit a more specific plan for development of the property.

MLGW called Starkey to testify. Starkey disputed Paschall's testimony that he was proposing a relocation of the gas line in their May 2002 conversations. Starkey said that he decided against relocating the pipeline when he found out that it would cost him more than $200,000, because the soil he wanted to excavate was only "worth $11,000" to him. He said that, in May 2002, he contacted Paschall for "guidance" on whether he could excavate dirt from the easement and "how much." Starkey said that he did not call Paschall in order to obtain MLGW's permission to excavate soil, and he did not believe that he needed authorization from MLGW for the excavation. Instead, Starkey said, he was discussing the matter with MLGW as a professional courtesy. According to Starkey, Paschall never told him that he could not dig within the easement; rather, Paschall told him only that he had to maintain the 42-inch minimum vertical cover and that he should call beforehand so that MLGW could supervise the process. Starkey asserted that he called Paschall and waited for two or three days for a response; it was not until two weeks later, he said, on June 6, 2002, that MLGW officials told him to stop. Starkey acknowledged that, at that point, he became argumentative with the MLGW officials and, despite MLGW's directive to stop excavating, he told his contractor to continue the excavation.[5]

_____

[5]While on the stand, counsel for MLGW also elicited testimony from Starkey about his assets in support of its claim for punitive damages. Starkey testified that he owned real properties worth a total of $1,303,177, which included the development property at issue, his home in Mississippi, and approximately eight acres of land at Pickwick Lake in

-4-

MLGW's supervisor of gas engineering, Mike Bridges, testified about the steps MLGW took after learning that Starkey was excavating dirt within the easement. Bridges said that when he visited the site on June 6, 2002, he observed the excavation and the track marks in the dirt. Causing even more concern was a "burn pit" for debris sitting no more than three or four feet from the gas line.[6] He then convened a meeting of MLGW officials and directed them to order Starkey to cease the excavation. Bridges said that on June 20, 2002, when MLGW started the corrective work, they "became very concerned . . . . This large a [gas] line sitting in a little pedestal of dirt like that with 800 pounds of pressure on it was something we felt we couldn't live with."

On cross-examination, Bridges conceded that no exact measurements were taken to determine the amount of dirt needed to restore the vertical and lateral cover to the gas line. He explained: "[N]o calculations were made . . . because when you're in the middle of a fire you don't stop and say let's generate some plans and some calculations . . . . This was an emergency situation . . . to make it safe." He said that making exact calculations would have necessitated a survey, which would have delayed the work by at least two days. Because of the exigencies of the situation, Bridges simply instructed MLGW's contractor, whom he knew to have 30-plus years in gas construction, to make the easement site safe and to leave a plateau at a three-to-one slope so that MLGW could safely move equipment onto the easement site if necessary. Bridges estimated that MLGW replaced approximately a third of the amount of dirt that Starkey excavated from the easement site.

MLGW also presented testimony about the decrease in vertical cover that took place after MLGW's June 10, 2002 letter to Starkey, telling him that his unauthorized excavation had created a dangerous situation. Paul Dobbins, a crew leader for MLGW, testified that he took two sets of depth measurements at the easement site. The first set, taken on June 14, 2002, indicated that between 69 and 96 inches of cover remained on top of the gas line at that time. The second set, taken on June 20, 2002, reflected a significant decrease in cover, showing that only 18 to 24 inches of cover remained on top of the gas line. These measurements do not account for the dirt removed from alongside the gas line. Dobbins corroborated Bridges' testimony that, as of June 20, 2002, the situation had become dangerous. On that day, Dobbins stated, MLGW started "bleeding" the gas line to relieve the pressure.

Bill Kizer, the contractor hired by Starkey to excavate the soil on the property, testified as well. Kizer testified that MLGW officials came out to the property on several occasions, told him to stop excavating and warned him of the dangers. Kizer said that he responded to the MLGW officials by telling them to "[t]ell Mr. Starkey. I'm working for him, and I need to do what he wants." Starkey instructed Kizer to continue the excavation. Kizer testified that his crew excavated so much dirt from within the easement site that, in one particular location, the dirt on one side of the

_____

Tennessee. In addition, Starkey said that he owned an antique car worth $10,000 and a boat worth approximately $2,000.

[6]Later testimony from Starkey's contractor, Bill Kizer, indicated that the "burn pit" may have pre-existed the excavations. Kizer testified that neither he nor his employees burned any debris at the easement site.

gas line fell away, completely exposing the gas line. He reported that he could see the pipeline.[7] According to Kizer, MLGW hauled in dirt and immediately covered the exposed location. Kizer speculated that, by the time the excavation ceased, there was about two feet of vertical cover left over the gas line.

Finally, MLGW presented expert testimony from Bob Conrad, a consulting engineer who helped design the safety features on the gas line at issue. Conrad explained that this particular gas line is in an "overbend" position, meaning that it does not extend lengthwise in a straight line. Rather, the gas line begins at a lower elevation on one end of Starkey's property, gradually rises, and then gradually descends towards the other end of the property. Because of this, the pipeline requires sufficient lateral support to prevent it from rolling to its side. Conrad testified that Starkey's excavation created the risk of the pipeline rolling over. A roll over would have caused torque on the pipeline and the possibility of a rupture. In light of the danger, Conrad believed that MLGW should have asked for law enforcement to intervene sooner.

Conrad also testified about the repair work necessary after Starkey stopped excavating the soil on the property. He said that it would have been "optimal" to replace enough dirt to the easement so that there would be at least 42 inches of cover extending the entire width of the 75-foot wide easement, but he conceded that it would have been sufficient, for safety, erosion, and maintenance purposes, to extend the 42-inch cover 25 feet on either side of the gas line and then to "slope" the remaining 25 feet. Conrad said that it would not be necessary to restore the easement to its original grade.

On the issue of damages, MLGW submitted testimony and documentary evidence reflecting a total loss of $174,737.50. This figure included $139,535.50 for the 21,467 yards of dirt, $14,303 for the cost of labor and other expenses for replacing the soil in the easement, $15,911 in wages for MLGW's in-house labor and for the officials who visited the site, and $4,988 in gas lost when MLGW shut down the gas line.

After MLGW concluded its proof, Starkey took the stand again to testify in his own behalf. Despite contrary testimony from his contractor, Kizer, Starkey asserted that he only "took two feet off the top" of the gas line and that "95 percent of the dirt [removed] came from the side of that pipe." Starkey said that, by the time he received the June 10, 2002 letter from MLGW, he had already begun excavating alongside the gas line. In addition, Starkey claimed that his excavation completely ceased as early as June 14, 2002, the date that Paul Dobbins visited the easement site to take depth measurements. In support of these assertions, counsel for Starkey entered into evidence a set of photographs that Starkey took on June 18, 2002. Some of these photographs depicted small patches of grass or weeds on the east end of the easement, which were growing on top of the "teepee"-shaped mound of dirt covering the pipeline. Other photographs showed the markers, or stakes, that Paul Dobbins placed in the dirt on top of the pipeline during his June 14, 2002

---

[7]At trial, Starkey strongly disputed that any portion of the gas line became exposed during the excavation. When questioned about the exposed gas line, he said, "This is a lie. That has been fabricated from this whole project."

measurements. Starkey testified that the photographs showed the amount of cover indicated by the June 14, 2002 measurements. Starkey asserted that neither he nor anyone under his direction removed any dirt from the top of the gas line between June 18, 2002 and June 20, 2002.

In addition, Starkey took issue with the amount of dirt MLGW hauled in to replace the dirt that was excavated. Starkey said that when he visited the site after MLGW completed its corrective work, "what caught my eye was how much extra dirt they put on the east end" of the easement. In some areas, he said, it appeared that MLGW exceeded the original elevation of the easement. In support of this assertion, Starkey presented the testimony of James Helton. Helton had prepared the topographical map submitted by Starkey to MLGW during their initial discussions. After MLGW finished its corrective work, Helton measured the elevation of the easement site. Based on his measurements, Helton testified that some areas now had approximately two feet more vertical cover than before Starkey's excavation and other areas had a foot or so less. Helton prepared a drawing, submitted into evidence, that compared the original elevation of the vertical cover, prior to Starkey's excavation, to the elevation of the vertical cover after MLGW completed its corrective work.

At the conclusion of the proof, the trial court issued its ruling from the bench. The trial court first noted that MLGW is charged with a heightened duty to ensure that its underground gas transmission lines are safe for the public. It expressly credited Kizer's testimony on the extent of Starkey's excavation, and found that Starkey, by continuing to excavate without authorization from MLGW, prevented MLGW from maintaining this particular gas line in a reasonably safe manner. Based on these findings, the trial court held Starkey liable for interference with the use and enjoyment of MLGW's easement, and awarded MLGW the full $174,737.50 requested in compensatory damages. As to the amount of dirt MLGW restored to the easement site, the trial court found that "the evidence show[ed] that [MLGW] restored only about one-third of the dirt" that Starkey removed. Finally, the trial court concluded that MLGW had established by clear and convincing evidence that Starkey intentionally interfered with the use and enjoyment of MLGW's easement. After considering a number of the factors outlined in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901-02 (Tenn. 1992), the trial court awarded MLGW $11,000 in punitive damages. This ruling was memorialized in an order entered on April 24, 2006.[8] Starkey then filed a timely notice of appeal.

In this appeal, Starkey does not dispute the finding of liability or intentional interference. Instead, the issues on appeal relate solely to the award of damages. These issues are: (1) whether the trial court erred in not considering whether MLGW mitigated its damages; (2) whether there was sufficient evidence to support an award of $174,737.50 in compensatory damages; and (3) whether the trial court had sufficient evidence upon which to calculate an award of punitive damages.

_____

[8]The trial court's April 24, 2006 order did not constitute a final and appealable judgment under Rule 3 of the Tennessee Rules of Appellate Procedure, because MLGW's request for attorney's fees remained unresolved. As a result, the cause was remanded for the limited purpose of entering a final judgment. On March 14, 2007, the trial court entered a final order, and the record was supplemented to include a copy of that order. The order finalized the judgment in accordance with Rule 54.02 of the Tennessee Rules of Civil Procedure.

In the appeal of a damages award, the appellate review of "[w]hether the trial court has utilized the proper measure of damages is a question of law that we review *de novo*." **Beaty v. McGraw**, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998); *see also Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). The amount of damages awarded, however, is a question of fact so long as the amount awarded is within the limits set by the law. **Beaty**, 15 S.W.3d at 829. Thus, in a non-jury case such as this, we review the amount of damages awarded by the trial court with a presumption of correctness, unless the preponderance of the evidence demonstrates otherwise. *See* Tenn. R. App. P. 13(d); **Beaty**, 15 S.W.3d at 829 (citing **Armstrong v. Hickman County Highway Dep't**, 743 S.W.2d 189, 195 (Tenn. Ct. App. 1987)). Great weight is given to factual findings that are based on the trial court's assessment of witness credibility. **Smith v. Smith**, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002). This is because the "trial judge as the trier of fact had the opportunity to observe the manner and demeanor of all of the witnesses as they testified from the witness stand." **Whitaker v. Whitaker**, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); **McCaleb v. Saturn Corp.**, 910 S.W.2d 412, 415 (Tenn. 1995).

The first issue presented in this appeal concerns the mitigation of damages. The doctrine of mitigation of damages dictates that,

> one who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover.

**Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.**, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971). Thus, a party injured by the wrongful act of another is under a legal duty to use reasonable efforts to minimize the loss and, to the extent that the injured party fails to do so, he or she cannot recover. *Id.*; *see also Kline v. Benefiel*, No. W1999-00918-COA-R3-CV, 2001 WL 25750, at *7 (Tenn. Ct. App. Jan. 9, 2001). The injured party is not, however, required to mitigate damages where the duty would impose an undue burden or be impossible under the circumstances. *See Kline*, 2001 WL 25750, at *7 (citing **Cummins v. Brodie**, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983)).

In the instant case, Starkey argues that MLGW failed to mitigate its damages by failing to minimize the volume of dirt replaced in the easement as a corrective measure. Starkey notes that, in its June 10, 2002 letter, MLGW told him that he could cure the problem by restoring 42 inches of cover to the easement site, with a three-to-one slope extending to the north and south lines of the easement. He also points to the testimony of MLGW's expert witness, Bob Conrad, who indicated that it was unnecessary to restore the easement to its original elevation, and that it would have been sufficient to restore 42 inches of cover on the top of the gas line extending 25 feet to each side. Starkey contends that MLGW used a "sledgehammer to kill a flea," noting that he paid his contractor to move approximately "$11,000 worth of dirt," while MLGW spent $139,535.50 for replacement dirt to restore the easement. From this, Starkey argues that the trial court erred in permitting MLGW to recover for costs in excess of that necessary to restore 42 inches of cover to the easement.

At the outset, we recognize that MLGW, as a supplier of gas, is charged with a duty to ensure that its underground transmission lines are adequately protected and safe for the public. *Cf. Rollins v. Electric Power Bd.*, No. M2003-00865-COA-R3-CV, 2004 WL 1268431, at \*6 (Tenn. Ct. App. June 8, 2004) (finding that a utility easement holder that supplies electricity "is charged with the heightened duties for public safety"). The underground gas transmission line at issue in this lawsuit is the highest pressure gas main in Shelby County, servicing a third of the entire county. MLGW's internal policies require that the pipeline be installed with vertical cover in excess of that mandated by Federal regulations. *See* 49 C.F.R. § 192.327. Apart from the obvious danger inherent with any pipeline transmitting a highly flammable substance, the evidence showed that the "overbending" installation of this particular gas line created the risk of the pipeline "rolling over" and rupturing if it did not have sufficient lateral ground support. Testimony from Starkey's own contractor, expressly credited by the trial court, indicated that so much dirt was removed from within MLGW's easement site that the gas line was completely exposed in one location. Moreover, Starkey's own photographs show that his excavation left only a "teepee"-like mound of dirt over the length of the gas line, leaving the pipeline essentially sitting above ground level with a compromised vertical cover and insufficient lateral support.

Throughout the events that spawned this lawsuit, in his determination to develop his property, Starkey consistently displayed a casual, nay, an arrogant attitude toward the danger to the public created by his actions. Initiating excavation within the easement without any authorization or participation by MLGW, Starkey obstinately and recklessly continued excavating even after receiving explicit warnings about the risks, stopping only when threatened with arrest. The evidence fully supports the trial court's finding that Starkey's reckless conduct created an emergency situation that required immediate corrective measures. In this appeal, Starkey gives only perfunctory recognition to MLGW's obligation to protect the public, arguing that MLGW was required to "mitigate" its damages by precisely measuring the amount of soil replaced so as to put in only the minimum required vertical cover for the pipeline. However, in these circumstances, MLGW's first obligation was to ensure that the pipeline did not leak or rupture for lack of either vertical cover or lateral support. This was a much more important concern than minimizing the amount of replacement dirt for which Starkey would later be required to pay. Starkey's argument on mitigation of damages is without merit.

Starkey also argues on appeal that the record does not contain sufficient evidence to support the trial court's award of $174,737.50 in compensatory damages. The primary goal of a compensatory damage award is to make the injured party whole, see *Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975), or stated differently, to restore the injured party to the position that the injured party would have been in had the wrongful conduct not occurred. *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998). Compensatory damages need not be calculated with "mathematical precision." *Id.* (citing *Provident Life & Accident Ins. Co. v. Globe Indem. Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928)). The damages must, however, be proven with reasonable certainty. *Id.* (citing *Act-O-Lane Gas Serv. Co. v. Clinton*, 245 S.W.2d 795, 802 (Tenn. Ct. App. 1951)).

On this issue, Starkey contends that MLGW failed to establish that his excavation left only 18 to 24 inches of vertical cover over the gas line, as reflected in MLGW's June 20, 2002 depth measurements. Starkey also asserts that because MLGW "did not take time to do calculations to determine the exact volume of replacement dirt" necessary to correct the easement, it cannot prove the extent to which it was damaged or the cost of restoring the easement to its "pre-removal depth." In support, Starkey points to the June 18, 2002 photographs depicting a few small patches of grass and weeds growing in the dirt atop the gas line on the east end of the easement.

The June 18, 2002 photographs, however, depict only a small portion of the easement. They are also consistent with the testimony of MLGW's witnesses that Starkey's excavation resulted in a "teepee" of dirt over the gas line, and that the bulk of the soil excavated came from alongside the gas line, removing virtually the entire lateral support for the pipeline.

Moreover, MLGW's supervisor of gas engineering estimated that MLGW replaced only a third of the dirt removed by Starkey during his excavation, and this testimony was credited by the trial court. Given the immediate danger created by Starkey's brazen conduct, MLGW was required to act quickly to protect the public, and it is unsurprising that its remedial actions resulted in elevations in the easement that were higher than the original elevation in some places and lower in others. Starkey, having created the exigent circumstances requiring quick action, cannot now complain that MLGW may have put in more dirt than was minimally necessary in some areas to alleviate the immediate hazard. We find that the trial court's award of compensatory damages was fully supported by the evidence.

Finally, it must be determined whether the trial court erred in awarding $11,000 in punitive damages to MLGW. The law on punitive damages is well-settled in Tennessee. Once a court determines that a plaintiff is entitled to actual damages, *Oakley v. Simmons*, 799 S.W.2d 669, 672 (Tenn. Ct. App. 1990), it may award punitive damages if the plaintiff shows, by clear and convincing evidence, that the defendant acted intentionally, fraudulently, maliciously, or recklessly. *E.g.*, *Culbreath v. First Tenn. Bank*, 44 S.W.3d 518, 527 (Tenn. 2001). If the trial court determines that the defendant is liable for punitive damages, it must, to the extent relevant, consider the factors outlined by the Tennessee Supreme Court in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992),[9] in assessing the amount of punitive damages to be awarded. *Id.* at 901; *Coffey v. Fayette*

[9]These factors are as follows:

(1) The defendant's financial affairs, financial condition, and net worth;
(2) The nature and reprehensibility of defendant's wrongdoing, for example
(A) The impact of defendant's conduct on the plaintiff, or
(B) The relationship of defendant to plaintiff;
(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;
(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;
(5) The expense plaintiff has borne in the attempt to recover the losses;
(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

***Tabular Prods.***, 929 S.W.2d 326, 328 (Tenn. 1996). Punitive damages are not awarded to compensate the injured party, but instead serve to punish the wrongdoer and to deter the wrongful conduct. ***Coffey***, 929 S.W.2d at 328 (citing ***Huckeby v. Spangler***, 563 S.W.2d 555, 558-59 (Tenn. 1978)).

In this appeal, Starkey asserts that the trial court did not have sufficient evidence upon which to calculate an award of punitive damages, because it failed to consider proof of either the existence or absence of encumbrances attached to his property. As a result, Starkey asks this Court to remand the issue of punitive damages for further proceedings. We decline to do so.

It is clear from the record that the trial court considered a number of the ***Hodges*** factors listed above, including the reprehensibility and objectionable nature of Starkey's wrongdoing, the potential danger to the public, Starkey's awareness of the risks of harm, the impact on MLGW, and Starkey's reported financial condition, particularly the total value of his real properties, $1,303,177. As an additional factor, the trial court also found that Starkey sought to profit as a result of his wrongful conduct, moving dirt out of MLGW's easement that, according to Starkey's valuation, was worth $11,000. At no time during the trial on this matter did Starkey proffer any evidence as to the equity he held in his property or otherwise raise this issue to the trial court. Therefore, Starkey's argument that the trial court erred in not considering proof of equity must be considered waived. Tenn. R. App. P. 36(a) (2005); ***see also Johnston v. Houston***, 170 S.W.3d 573, 578 (Tenn. Ct. App. 2004) (noting that "an issue not raised in the trial court may not be raised for the first time on appeal"). Moreover, considering Starkey's flagrant indifference to the danger he created in the course of his quest to develop his property, a punitive damages award of a significantly higher amount would have been justified by the evidence. Therefore, this award is affirmed as well.

The decision of the trial court is affirmed, and the costs of this appeal are assessed against Defendant/Appellant Tommy Carl Starkey, and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

***Hodges***, 833 S.W.2d at 901-02.