IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2008 Session

# JOHN C. FILSON, ET AL. V. WELLS FARGO HOME MORTGAGE, INC.

**Appeal from the Chancery Court for Davidson County**
**No. 02-296-IV    Richard H. Dinkins, Chancellor**

---

**No. M2007-01842-COA-R3-CV - Filed August 25, 2008**

---

The mortgagors filed suit, charging the mortgagee with breach of contract for failure to comply with terms of a note, deed of trust, and automatic payment service plan pursuant to which the mortgagee agreed to automatically debit the mortgagors' bank account for monthly payments. The jury found the mortgagee guilty of breach of contract and awarded damages in the amount of $250,000. The trial court remitted this damage award to $150,000. On appeal, the mortgagee argues that the trial court erred by failing to grant the mortgagee's motions for directed verdict and for judgment notwithstanding the verdict on the ground that the mortgagors were guilty of the first uncured material breach of contract, by excluding evidence as a discovery sanction and by awarding the mortgagors $150,000. The mortgagors contend that the mortgagee waived all issues by not including them in its motion for new trial. After careful review, we hold that 1) the mortgagee did not waive its issues for purposes of appeal because the issues were included in the memorandum of law it incorporated in the motion for new trial; 2) the trial court did not abuse its discretion in excluding certain evidence as a discovery sanction upon our finding that the mortgagee failed to explain why the excluded evidence was not timely provided to the mortgagors or to establish its importance at trial; 3) the trial court did not err in failing to grant the mortgagee's motions for directed verdict and judgment notwithstanding the verdict upon our finding that the mortgagee was guilty of the first uncured material breach of contract by failing to timely institute its automatic payment service plan; and 4) in compliance with the mortgagee's request, this case is remanded for a new trial solely on the issue of damages upon our finding that the trial court's award of damages in the amount of $150,000 is not supported by the evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Vacated in Part; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

1

Bradley E. Trammell, Memphis, Tennessee, for the appellant, Wells Fargo Home Mortgage, Inc.

Donald Capparella, Amy J. Farrar, and Leroy J. Ellis, Nashville, Tennessee, for the appellees, John C. Filson and Angela H. Filson.

## *OPINION*

### *I. Background*

In October of 1993, the appellees, John C. Filson and Angela H. Filson, borrowed $113,900 from Union Planters Bank to purchase a home in Nashville. The loan was secured by a deed of trust and promissory note in favor of the lender bank, providing for repayment of the loan amount with interest over a thirty year period. Over the next eight years, the Filsons made the payments required under the mortgage and, with few exceptions, such payments were timely.

In January of 2001, Wells Fargo Home Mortgage, Inc., ("Wells Fargo") assumed ownership of the Filsons' mortgage, and that same month, mailed Mr. Filson a form to enroll in its program entitled Automatic Mortgage Payment ("the auto pay service"), which permitted Wells Fargo to debit the Filsons' bank account for their monthly mortgage payments, making it unnecessary for the Filsons to mail a payment check to Wells Fargo each month. Once enrolled in the auto pay service, the participant would no longer receive monthly billing statements. Mr. Filson completed the enrollment form and returned it to Wells Fargo. At the time he submitted the form, the Filsons' monthly mortgage payment was $950.04. The auto pay service is not available to a borrower whose loan payments are delinquent, and the record confirms that when Wells Fargo took over the loan in January of 2001, the Filsons were current in their payments to the prior owner of the mortgage, having made timely payments to the latter in November and December of 2000.

On or around February 16, 2001, Wells Fargo contacted Mr. Filson and advised him that the Filsons' mortgage payments were overdue for January and February, indicating that Wells Fargo had not debited the Filsons' bank account for those months. On the date of this contact, Mr Filson sent Wells Fargo a check in the amount of $1,900.08 to cover the two requested payments. Since submitting the auto pay service enrollment application, the Filsons had received no statements from Wells Fargo as would have been consistent with the auto pay service being in effect. However, in March of 2001, Mr. Filson discovered that Wells Fargo had still not debited the Filsons' bank account, and therefore, on March 11, 2001, he mailed Wells Fargo a check in the amount of $950.04 to cover the Filsons' mortgage payment for that month.

Wells Fargo did not draft the Filsons' account for a payment in April of 2001, nor did the Filsons mail Wells Fargo a payment that month. On or around May 17, 2001, the Filsons sent Wells Fargo a check in the amount of $950.04, which Wells Fargo credited as the payment for April. After this payment, Wells Fargo still failed to debit the Filsons' account, and the Filsons did not send Wells Fargo any further payments until July of 2001, when Wells Fargo again called Mr. Filson. Mr.

2

Filson testified that on this occasion, the Wells Fargo representative advised him that, in order to bring the mortgage account current, the Filsons would need to send a check in the amount of $2,850.16. On July 12, 2001, Mr. Filson sent Wells Fargo a check in the amount of $2,850.12[1]. Wells Fargo presented evidence that when it received this check from Mr. Filson, the Filsons' monthly mortgage obligation had increased from $950.04 to $970.97, and upon its determination that the check was $62.79 insufficient to cover three payments, Wells Fargo applied $1,914.94 of the check amount to satisfy the payments due for the months of May and June and placed the balance in the amount of $908.18 in a suspense account that Wells Fargo utilizes to hold a borrower's money when a borrower makes an insufficient payment. Mr. Filson attests that as of this time, he had not been advised, and was not aware, that his monthly payment obligation had increased to $970.97, that the $2,850.12 had not been applied to completely satisfy the three months payments Wells Fargo had contacted him about, or that Wells Fargo had placed $908.18 of the $2,850.12 in its suspense account.

On August 2, 2001, approximately eight months after Mr. Filson returned the application to participate in the auto pay service, Wells Fargo instituted its first debit of the Filsons' bank account, depleting it by $970.97. Mr. Filson believed that, as of that date, his mortgage debt was current, given that he had been advised by Wells Fargo that the auto pay service would not be available to a delinquent borrower. However, unbeknownst to the Filsons, Wells Fargo, having concluded that the prior payment of $2,850.12 was only sufficient to cover the months of May and June, applied the $970.97 debited amount that the Filsons thought was being applied to pay their August obligation, to pay the July payment, which Wells Fargo had determined to be delinquent.

Apparently assuming that the auto pay service was in operation and that their account was being timely debited by Wells Fargo for payments due, the Filsons did not send Wells Fargo further payments. Then, according to Mr. Filson's testimony, on or about October 20, 2001, a Wells Fargo representative contacted him and advised him that the Filsons were in default on the mortgage and had never made a payment for August of 2001. Mr. Filson responded that he was on the auto pay service, that the August payment had been drafted from his account, and that he had a bank statement confirming this debit. Mr. Filson attests that he was then told by Wells Fargo that "it didn't matter what I had, that I was not on [the auto pay service] and never had been" and that Wells Fargo had never taken the money out of his account. Mr. Filson also attests that he faxed Wells Fargo a copy of the referenced bank statement but "[n]obody wanted to acknowledge its presence" and "I was told I was crazy, if you just pay your bills on time, none of these problems would be happening for you."

Mr. Filson testified that despite his efforts over the next several weeks, he was not able to discover what became of the money that Wells Fargo had debited from the Filsons' bank account. On November 19, 2001, Mr. Filson sent Wells Fargo a check for $2,874, as payment for the three months of September, October, and November 2001. Wells Fargo returned this check to the Filsons

---

[1]Although Mr. Filson testified that he was advised to send a check for $2,850.16, the record shows, as we have stated, that the check he mailed as a result of this conversation was in the amount of $2,850.12. We will assume that Mr. Filson misspoke and that the latter figure is the figure he intended in his testimony as such does clearly correspond to the sum of three payments of $950.04.

stating that "it is less than the total amount due on your account at this time." Shortly thereafter, on November 23, 2001, the Filsons received notice that Wells Fargo would be foreclosing on their home. Mr. Filson contacted Wells Fargo immediately and was advised by their representative that they could no longer discuss the Filsons' mortgage and that Mr. Filson would have to speak with Wells Fargo's legal counsel. Mr. Filson called the law firm representing Wells Fargo and was advised that they would investigate the matter and get back to him; however, he did not hear from them again.

Still seeking to determine what became of the $970.97 that had been drafted from the Filsons' bank account in August of 2001, at some time before the middle of December 2001, Mr. Filson was able to speak with Wells Fargo representative, Thavy Yin, who, Mr. Filson attests, "was listening and trying to understand what it was I had to say." Mr. Filson testified that Ms. Yin admitted to being confused, but that she was trying to "get to the bottom of this whole situation." Ms. Yin advised Mr. Filson to wait until Wells Fargo's research department determined why payments had not been drafted from the Filsons' bank account under the auto pay service and instructed Mr. Filson not to send in any further payments until the matter was resolved. Mr. Filson spoke with Ms. Yin again on December 28, 2001, and at this time, she revealed to him that $908.18 of the $2,850.12 payment that Mr. Filson had made in July of 2001 was being held in Wells Fargo's suspense account.

Subsequently, Wells Fargo sent Mr. Filson a reinstatement figure for the mortgage. Mr. Filson testifies that it was his contention that the foreclosure was the result of mistakes made by Wells Fargo and that the reinstatement fee included costs, such as attorney's fees, that he did not feel that he should have to pay. However, determined to save his home, he called Ms. Yin in early January of 2002 and advised her of his intent to pay the amount required to reinstate his mortgage and asked her what the final reinstatement amount would be once the $908.18 in Wells Fargo's suspense account had been credited. Ms. Yin responded that Wells Fargo would not allow Mr. Filson to use the $908.18 to pay the reinstatement amount.

The foreclosure was set for February 6, 2002, and shortly after learning that Wells Fargo would not agree to allow the Filsons to use the funds in the suspense account to offset the amount required for reinstatement, Mr. Filson sought and obtained an injunction to stop the foreclosure. Inter alia, the Filsons' complaint, as subsequently amended, alleged causes of action for "breach of contract and failure to fulfill their obligations under the terms of the [auto pay service]," violation of the Tennessee Consumer Protection Act, intentional infliction of emotional distress, lost earnings, lost income, and punitive damages. Wells Fargo filed a motion for directed verdict which was granted only as to the Filsons' claim for punitive damages. The case proceeded to trial by jury resulting in a verdict in favor of the Filsons on their cause of action for breach of contract and an award of damages in the amount of $250,000. The jury found in favor of Wells Fargo as to the Filsons' claims for intentional infliction emotional distress and violation of the Tennessee Consumer Protection Act. Later, Wells Fargo filed its motion for judgment notwithstanding the verdict, motion to alter or amend, renewed motion for directed verdict, motion for remittitur, and/or motion for new trial. By subsequent orders, the trial court granted the motion for remittitur, reducing the jury's

4

award of damages from $250,000 to $150,000, and denied all of the remaining motions. The trial court also ordered the Filsons to resume their mortgage payments to Wells Fargo, as required by their note and deed of trust. Wells Fargo appeals.

## II. Issues

The following issues are address herein:

1) Whether Wells Fargo waived all issues raised on appeal because it neglected to include them in its motion for new trial.

2) Whether the trial court abused its discretion by excluding a letter from evidence as a discovery sanction against Wells Fargo.

3) Whether the trial court erred in failing to grant Wells Fargo's motions for judgment notwithstanding the verdict and directed verdict upon the ground that the Filsons, not Wells Fargo, were guilty of the first uncured material breach of contract.

4) Whether the trial court's award of damages in the amount of $150,000 was supported by the evidence.

## III. Discussion

### A. Standard of Review

The issues presented for our review in this appeal call for the application of various standards of review.

First, in reaching our determination as to whether Wells Fargo waived all issues on appeal by not raising such issues in its motion for new trial, we address an appellate matter of law not raised in the court below. Because our review of this issue does not require an assessment of any prior judgment, our review of this issue is, of course, de novo.

In reviewing the issue of whether the trial court properly denied Wells Fargo's post-trial motions for judgment notwithstanding the verdict and for directed verdict, we note that these motions[2] are subject to the same standard of review, which we recently summarized as follows:

> Directed verdicts under Tenn. R. Civ. P. 50.01 and judgments notwithstanding the verdict under Tenn. R. Civ. P. 50.02 are reviewed using the same standard of review. *Holmes v. Wilson,* 552 S.W.2d

---

[2]As noted by the Tennessee Supreme Court in *Whaley v. Perkins*, 197 S.W.3d 665, 669 n.3 (Tenn. 2006), "a judgment notwithstanding the verdict is a post trial motion for a directed verdict."

5

682, 685 (Tenn. 1977). They are appropriate only when reasonable minds cannot differ as to the conclusion to be drawn from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). A case should not be taken away from the jury, even when the facts are undisputed, if reasonable persons could draw different conclusions from the facts. *See Gulf, M. & O. R. Co. v. Underwood*, 187 S.W.2d 777, 779 (Tenn. 1945). A trial court may, however, direct a verdict with regard to an issue that can properly be decided as a question of law because deciding purely legal questions is the court's responsibility, not the jury's.

In appeals from a directed verdict[3], the reviewing courts do not weigh the evidence, *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995), or evaluate the credibility of witnesses. *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992). Instead, they review the evidence in the light most favorable to the motion's opponent, give the motion's opponent the benefit of all reasonable inferences, and disregard all evidence contrary to that party's position. *Alexander v. Armentrout*, 24 S.W.3d at 271.

*Jenkins v. Brown*, M2005-02022-COA-R3-CV, 2007 WL 4372166, at *5-6 (Tenn. Ct. App. M.S., filed Dec. 14, 2007) (some citations omitted).

With respect to the standard of review governing the question of whether the trial court erred in sanctioning Wells Fargo by excluding a letter that Wells Fargo sought to introduce as evidence, we note the following statements of the Tennessee Supreme Court:

Although the Tennessee Rules of Civil Procedure do not provide a sanction for abuse of the discovery process, trial judges have the authority to take such action as is necessary to prevent discovery abuse. Trial courts have wide discretion to determine the appropriate sanction to be imposed. Such a discretionary decision will be set aside on appeal only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. Appellate courts should allow discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness.

*Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 133 (Tenn. 2004) (citations omitted).

Finally, the trial court's determination that $150,000 is the proper award of damages in this

---

[3]Or, as in the instant matter, a denial of a directed verdict.

6

case is reviewed under the standard which we recently restated as follows:

> In the appeal of a damages award, the appellate review of "[w]hether the trial court has utilized the proper measure of damages is a question of law that we review de novo." The amount of damages awarded, however, is a question of fact so long as the amount awarded is within the limits set by the law.

*Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 352 (Tenn. Ct. App. 2007). There is no dispute that the $150,000 awarded the Filsons by the trial court was within the legal limits, and thus, we review the propriety of such award as a question of fact. The standard of review of a trial court's findings of fact is de novo, and we must assume that such findings are correct absent evidence preponderating to the contrary. Tenn. R. App. P. 13(d); *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d 595, 598 (Tenn. Ct. App. 2006).

### B. Waiver of Issues

We begin with the Filsons' argument that Wells Fargo has waived all issues it raises on appeal upon allegation that none of these issues were raised in its motion for a new trial. In support of this argument, the Filsons cite Tenn. R. App. P. 3(e) which provides in pertinent part as follows:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e).

The Filsons contend that the motion for new trial filed by Wells Fargo raises no specific issues and makes no mention of its arguments that the Filsons were the first to breach the contract, that there was no support for the award of damages, or that the trial court erred in excluding evidence as a discovery sanction against Wells Fargo. Accordingly, the Filsons maintain, Wells Fargo is precluded from raising these issues on appeal. We disagree.

While it is true that no specific issues are raised in the body proper of Wells Fargo's motion for new trial, such motion provides that "[a]s grounds, Wells [Fargo] relies on its Memorandum in Support contemporaneously filed with the Court." We construe this language as incorporative of all issues set forth in such memorandum, which is a part of the record before us and specifically sets forth all of the issues that Wells Fargo presents for our review. Our conclusion that all such issues are properly before this court is in accord with our prior decision in *Johnson v. Allstate Ins. Co.*,

M1999-01639-COA-R3-CV, 2000 WL 1156642 (Tenn. Ct. App. M.S., filed Aug. 16, 2000) wherein we treated the appellant's memorandum of law in support of its motion for new trial as a component of such motion, noting as follows:

> The motion for new trial filed by [appellant] does not specifically set out any alleged error, but refers to its memorandum of law in support of its motion for a new trial. Normally, a memorandum of law is not filed as part of the record, although it is a part of the record in this case. Moreover, the specifications of the alleged errors in the memorandum do not comply in many instances with the specificity required by Rule 3(e). However, in this instance, the Court will treat the memorandum as a part of the motion for a new trial and consider the issues as presented.

*Johnson*, 2000 WL 1156641, at *2.

The Filsons' argument that Wells Fargo has waived the issues it asks us to review on appeal is without merit.

### *C. Exclusion of Evidence*

The next issue we address is whether the trial court's discovery sanction of excluding evidence that Wells Fargo sought to introduce was an abuse of discretion. The evidence in question consists of a letter dated July 20, 2001, that Wells Fargo purportedly sent to the Filsons and which, Wells Fargo argues, contradicts Mr. Filson's testimony as to when he became aware that his monthly payments had increased to $970.97, and that Wells Fargo had placed $908.18 of Mr. Filson's payment in its suspense account. As set forth in the following bench conference among the trial court; Leroy Ellis, counsel for the Filsons; and Jason Mangrum, counsel for Wells Fargo, the trial court ruled that the letter should be excluded after the Filson's attorney's objection to its introduction upon the ground that it was first produced just three days before the November 13, 2006 trial:

> MR. ELLIS: Your Honor, this is a document that we requested in discovery in 2002. We've requested all documents pertaining to communications with Mr. Filson regarding his account in 2002. This document was produced Friday. The first time we ever received this document was November 10. That was the Friday before this trial was the first time that document was ever produced to my office.

> MR. MANGRUM: That's true, Your Honor. There's no doubt about that. That's when I got it from my client. But as far as this document goes, it goes directly to impeach Mr. Filson's statement that he never got anything here.

THE COURT: Well, the point is, was it asked for previously, and why was it not provided previously?

MR. MANGRUM: We provided it as soon as I became aware of it. It's not something that I had either.

THE COURT: Well, why didn't your client provide it previously, and how did you get it just the weekend before trial?

MR. MANGRUM: I agree, Your Honor. It's certainly not a good situation, but it goes directly toward impeaching that statement.

. . .

THE COURT: Well, I don't know why this wasn't provided. There's no - - no cause has been shown for it not being provided, so I'll exclude it.

We have previously noted the standard of review which recognizes the "wide discretion" of a trial court to fashion an appropriate sanction for discovery abuse. *See Mercer*, 134 S.W.3d at 133. As the Tennessee Supreme Court further stated in *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709, (Tenn. Ct. App. 1999), "[w]hen reviewing a trial court's discretionary decision, appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision."

The courts of this state have further ruled that in reaching its decision as to an appropriate sanction for failure to provide discovery, the trial court should consider, 1) the reason(s) that the requested discovery was not provided; 2) the importance of the evidence; 3) the time required to respond to the evidence; and 4) the possibility of a continuance. *See Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988); *Pettus v. Hurst*, 882 S.W.2d 783, 787 (Tenn. Ct. App. 1993); *Kuehne & Nagel, Inc. v. Preston, Skahan & Smith Int'l, Inc.*, M1988-00983-COA-R3-CV, 2002 WL 1389615 at *4 (Tenn. Ct. App. M.S., filed June 27, 2002).

With respect to the question of why the document at issue was not timely provided to the Filsons by Wells Fargo, Wells Fargo's attorney's response indicates that he provided the document "as soon as [he] became aware of it." While this response may excuse Wells Fargo's attorney from not previously providing the document to the Filsons, it certainly does not excuse his client. It is apparently undisputed that since 2002, Wells Fargo was under an ongoing obligation to produce all documents pertaining to communications with the Filsons regarding their account with Wells Fargo. The record is devoid of any justification for Wells Fargo's failure to meet this obligation. Furthermore, the letter in question, a copy of which has been presented for our review, is not on Wells Fargo letterhead and is unsigned, and the record does not establish that it was even received by the Filsons. Accordingly, we do not agree that the probative value of this evidence was clearly

9

demonstrated.  Given Wells Fargo's failure to establish a reasonable excuse for failure to timely provide the letter and its failure to establish the letter's importance in the case, we do not agree that an inquiry into what amount of time might have been required to respond to such evidence and the possibility of a continuance demand consideration.  As we have indicated, a trial court's decision as to the sanction it will impose for discovery abuse will not be set aside unless the trial has misapplied a controlling legal principle or has acted inconsistently with the weight of the evidence.  In the instant matter, we do not find that the trial court has done either, and we do not find that the trial court abused its discretion in excluding the subject document from evidence.

### D. Breach of Contract

The next issue we address is whether the trial court erred in failing to grant Wells Fargo's motions for directed verdict and for judgment notwithstanding the verdict upon the ground that the Filsons were guilty of the first uncured material breach of the parties' contract.

It is well settled in this state that "a party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *Carter v. Krueger*, 916 S.W.2d 932, 936 (Tenn. Ct. App. 1995).  In cases where both parties have not fully performed their contractual duties, the trier of fact must determine which party is chargeable with the first uncured material breach.  *See id.*  Thus, bearing in mind the standard governing our review of a motion for directed verdict or motion for judgment notwithstanding the verdict, in the present matter, we must view the evidence in the light most favorable to the Filsons, give them the benefit of all reasonable inferences, and disregard all evidence contrary to their position.  After such review, we must affirm the judgment of the trial court unless a contrary result cannot be reasonably disputed.  Wells Fargo insists that the record establishes beyond reasonable dispute that the Filsons were guilty of the first uncured material breach of the parties' contract by their failure to make a timely payment in April of 2001.  Although the jury did not indicate how or when it believed Wells Fargo breached the contract, the Filsons contend that Wells Fargo had already materially breached the contract in the preceding months, beginning in January of 2001, by failing to debit the Filsons' bank account under the auto pay service.  While we do not agree with the Filsons as to when Wells Fargo breached the contract, it is, nevertheless, our determination that Wells Fargo was guilty of the first uncured material breach of the contract.

The terms of the note executed by the Filsons in October 1993, pursuant to which they agreed to repay the original loan of $113,900, provide that the Filsons will "pay principal and interest due by making payments every month," that such payments will be made "on the 1st day of each month," and that the Filsons "will make these payments every month until [they] have paid all of the principal and interest and other charges [owed under the note]."  The accompanying deed of trust also contains language providing that the Filsons "shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note."  The note specifically states that "[i]f I do not pay the full amount of each monthly payment on the date it is due, I will be in default."

While the Filsons apparently do not deny that they are bound by the above cited terms of the note and deed of trust or that they failed to make their monthly payment in April of 2001, they contend that Wells Fargo breached its promise to debit the Filsons' bank account for their monthly payment in January when the Filsons signed up for the program and that it was properly left to the jury to decide if this failure constituted "the first _uncured_ material breach of the contract between the parties."

In pertinent part, the auto pay service enrollment form that was submitted to Wells Fargo by Mr. Filson in January of 2001 authorizes Wells Fargo to debit the borrower's checking or savings account for the current mortgage payment and allows the borrower to choose both the month that such debits will begin and a debit date within four days of the mortgage due date. The form also contains the following language emphasizing the borrower's continuing duties under the mortgage:

> I understand that this authorization and the services undertaken by Wells Fargo Home Mortgage in no way alters or lessens my obligations under my existing mortgage contract including those provisions regarding the amount of the monthly payments, when payments are due, the application of payments, the assessment of late charges or the determination of delinquencies.

Although the enrollment form does not set forth a specific time that Wells Fargo will begin the automatic debits after its receipt of the form from the borrower, it is well settled under the law of this State that "[w]here no provision is made in the contract for performance, a reasonable time is implied." **Minor v. Minor**, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993). In this regard, we have further noted as follows:

> What constitutes a reasonable time within which an act is to be performed where a contract is silent upon the subject depends on the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance.

_Id._ (quoting 17A Am.Jur.2d Contracts § 479 (1991)).

Mr. Filson testified that he is not sure when he received the auto pay service enrollment form from Wells Fargo in the mail ("around the end of 2000, beginning of 2001. I'm not sure of the exact date."), but that he enrolled in the auto pay service in January of 2001. He further testified that in completing that portion of the form that allows the borrower to select the date his account will be debited, he selected the second day of each month. Under these circumstances, it cannot reasonably be maintained that Wells Fargo was obligated to debit the Filsons' account for their January 2001 payment as it is impossible that Wells Fargo would have received and processed the enrollment form in time to institute a debit by that date, and the enrollment form specifically states that "[p]ast due payments cannot be debited." Thus, the Filsons remained obligated to send Wells Fargo a check for

11

their January 2001 payment, and when they failed to send such payment, they materially breached the terms of the note, the deed of trust, and the auto pay service enrollment form.

By February of 2001, it may be reasonably inferred that Wells Fargo would have received and processed the auto pay service enrollment form and therefore, under ordinary circumstances, would have been obligated, as of the second day of that month, to debit the Filsons' account for their mortgage payment. However, Wells Fargo was not so obligated because, at that point in time, the Filsons' January payment was still delinquent. It appears from Mr. Filson's testimony that the Filsons made the assumption, unwarranted under our above analysis, that Wells Fargo would debit their account for February, and therefore, they did not send in a payment for that month by the due date. Accordingly, by the middle of February, the Filsons were in material breach of contract for failure to make payments for both January and February. However, on or around February 16, 2001,Wells Fargo contacted the Filsons and notified them that the two payments were delinquent, and Mr. Filson immediately sent Wells Fargo a check for $1,900.08, thereby curing the prior breaches. Therefore, as of March 2, 2001, Wells Fargo was no longer justified in neglecting to debit the Filsons' bank account per the auto pay service, and by reason of its failure to debit the account as of that date, Wells Fargo was in material breach of the parties' contract. Although Wells Fargo finally did debit the Filsons' account in August of 2001, we do not agree that the delay of five months from March of 2001, when Wells Fargo was first obligated to debit the account, was timely enough to cure its breach. Consequently, we find no merit in Wells Fargo's argument that it could not be reasonably concluded that it was the first party guilty of an uncured material breach of the contract, and therefore, it is our determination that the trial court did not err in denying Wells Fargo's motions for directed verdict and judgment notwithstanding the verdict.

### E. Damages

The final issue we address is whether the award of damages in this case was warranted based upon presented proof. As noted, the jury originally awarded the Filsons damages in the amount of $250,000. Deeming this amount excessive, the trial court reduced the award to $150,000. Wells Fargo argues that even this diminished award was not supported by the evidence and that the case should be remanded for a new trial on the issue of damages. We agree.

The proper measure of damages in an action for breach of contract is to, as nearly as possible, place the non-breaching party in the same position it would have been in had there been no breach. *See* **GSB Contractors, Inc. v. Hess**, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005); **Wilhite v. Brownsville Concrete Co.**, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990); **Hennessee v. Wood Group Enters., Inc.**, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991). As we have heretofore stated, such "[d]amages ordinarily protect the injured party's expectation interests by awarding the party the benefit of its bargain." **Duffy Tool & Stamping, Inc. v. Bosch Auto Motors Corp.**, No. M1997-00144-COA-R3-CV, 2000 WL 122225 (Tenn. Ct. App. M.S., filed Feb. 1, 2000). We find no basis to support the finding, implicit in the trial court's award of damages, that such a large award is necessary to place the Filsons in the position they would have been in had Wells Fargo not breached its agreement.

12

In support of the trial court's award, the Filsons assert that they "experienced enormous disruption in their personal lives," "that Mr. Filson received nearly a year of stress and fear that he would lose his home," and that "he neglected his clients in his business, and ultimately lost his business as a result of having to spend so much time dealing with the problems caused by Wells Fargo." The Filsons also reference Mrs. Filson's testimony that her application to finance the purchase of a clothes washer was denied because of the effect of Wells Fargo's foreclosure on her credit rating. Finally, the Filsons observe that Wells Fargo failed to present any evidence challenging their proof of damages and that this omission alone justifies the Court in affirming the judgment for damages. We respectfully disagree in all regards.

As to the disruption, stress and fear asserted as bases for the amount awarded, we note that the jury verdict form shows that the jury specifically rejected the Filsons' claim for intentional infliction of emotional distress. With respect to the Filsons assertion that the $150,000 award is also supported by Mr. Filson's testimony that he suffered loss of business as a consequence of Wells Fargo's breach, we note that during trial, the Filsons withdrew their claim for any lost business income. Of itself, Ms. Filson's testimony that she was unable to finance the purchase of a clothes washer because of alleged damage to her credit rating does not provide a basis for a reasonable calculation of the dollar value of such damage. Finally, Wells Fargo's failure to present evidence challenging the Filsons' proof of damages is not fatal to its argument that the amount of damages awarded was not adequately supported. The party seeking damages bears the burden of proving them, and to the extent a party offers proof in support of an award of damages such proof "must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages." *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006). In this case, Wells Fargo has requested that we remand for new trial on the sole issue of damages and under these circumstances, the trial court's judgment awarding damages in the amount of $150,000 is vacated, and the case is remanded for trial solely on the issue of the proper amount of damages due the Filsons under the jury's verdict for breach of contract.

### IV. Conclusion

For the reasons stated herein, we affirm the verdict of the jury and the judgment of the trial court in all respects except that the judgment of the trial court remitting the award of damages to the amount of $150,000 is vacated, and the case is remanded for trial as to the proper amount of damages due the Filsons under their cause of action for breach of contract. Costs of appeal are assessed to the parties, equally.

_____

SHARON G. LEE,  JUDGE

13