Howell CURTIS, d/b/a Curtis
Mortgage Company

v.

MURPHY ELEVATOR COMPANY and
Rockwell International.

Civ. No. 3–75–253.

United States District Court,
E. D. Tennessee, N. D.

Jan. 13, 1976.

942

Calvin N. Taylor, William A. Young, Knoxville, Tenn., for plaintiff.

John P. Davis, Jr., Hodges, Doughty & Carson, Jerry A. Farmer, Knoxville, Tenn., for defendants.

ROBERT L. TAYLOR, District Judge.

## I. OPINION AS RENDERED FROM THE BENCH

This case was filed by Howell Curtis doing business as Curtis Mortgage Company against Murphy Elevator Co., Inc., Fincor, Inc., and Rockwell International. Since Fincor is owned by Rockwell International, a voluntary non-suit was taken against it at the request of plaintiff. Jurisdiction is based on diversity of citizenship and the amount in controversy. Murphy Elevator Company has filed a cross-claim against Rockwell seeking a judgment over for any amount that the plaintiff may recover from it.

Plaintiff seeks damages from the defendants because two elevators that were purchased from Murphy Elevator Company allegedly did not perform properly. The action is based upon alleged negligence, misrepresentations, and breach of warranty. Plaintiff says that Rockwell supplied defective component parts for the two elevators in question.

Plaintiff seeks damages for alleged breaches of Sections 47–2–313, 47–2–314, 47–2–315, T.C.A., and also for breach of Sections 402B and 552D of the Restatement of Torts, 2d. Ed., as well as damages for negligence.

Plaintiff claims that all of the defendants were guilty of negligence in design, manufacture, installation and servicing of the elevators and of the component parts supplied by Rockwell. Plaintiff seeks not only direct damages but also consequential damages.

Murphy denies liability but states that if it is liable that Rockwell should be made to reimburse it for the amount it is required to pay due to a breach of warranty by Rockwell in the furnishing of component parts for the elevators.

Murphy denies that the elevators were improperly designed, improperly manufactured or installed, and denies that they were delivered to Curtis in a defective and unreasonably dangerous condition.

Murphy says that if it breached any warranty plaintiff is not entitled to recover because Murphy disclaimed any warranty except to replace certain parts within one year after the sales contract was consummated and any materials that were defective.

Murphy says further that the action is barred by the four-year statute of limitations contained in T.C.A. § 47–2–725.

Murphy denies that any false statements were made by it or its representatives to plaintiff concerning the elevators.

As an affirmative defense Murphy claims that plaintiff misused the elevators and that such misuse was the proximate cause of the troubles complained of in the complaint.

Murphy also contends that any malfunction of the elevators was caused by the negligence of plaintiff or its tenants or representatives in failing to properly service and maintain the elevators.

Another affirmative defense asserted by Murphy is the assumption of risk of any defects in the elevators. It is difficult for the Court to understand this defense.

Murphy says further that the elevators and the control mechanisms and wiring therein were substantially changed after

they were installed and accepted by the plaintiff.

Murphy says further that if the elevators were defective such defects were in the control panel manufactured by Rockwell and that any malfunction in the elevators was caused by the said control mechanism and that if it is liable to plaintiff the cross-defendant who has been sued in a cross-action by Murphy is liable to it for the amount awarded to the original plaintiff.

Rockwell denies any liability to Murphy under the cross-action.

Rockwell International denies liability both on the matters complained of in the complaint and on the matters complained of in the cross-action. Rockwell says no express warranties were made to plaintiff by it. It says further that any component parts of the elevator systems supplied by Rockwell were of merchantable quality; at the time these parts were purchased it had no knowledge of any particular purpose for which the parts were to be used; and that they were not unreasonably dangerous when they left the custody of Rockwell. This defendant says that no misrepresentations of a material character were made by them.

Rockwell says further that it was not guilty of any negligence in the manufacture or design of any component parts used in the elevator systems, strict quality control having been exercised on each part. It says further that plaintiff has not suffered any damage and there has been no depreciation of value in the building owned by plaintiff and in which the elevators are located.

It also states that the plaintiff or its lessee has misused the elevator systems and has failed to properly maintain them.

Rockwell says further that plaintiff or its lessee accepted the elevator systems as installed after approval by the State of Tennessee's inspector and therefore assumed the risk of any defect in the elevator systems.

It says further that the elevators and the control mechanism and wiring therein were substantially changed after installation and acceptance by the plaintiff and that the elevators are presently operating satisfactorily and have been so operating for some time.

Rockwell says further that if a defect exists in the elevator systems, it is in the areas designed, manufactured or installed by Murphy Elevator Co. and not with any component parts manufactured by and sold by this defendant.

The issues as formulated in the pretrial order are as follows:

(1) Is the present action barred by the four-year statute of limitations in T.C.A. § 47-2-725?

The answer to this question is No.

(2) Did the defendant violate any rights owed to the plaintiff either by negligence or by breach of any warranty; if so, did plaintiff sustain an injury or injuries as a direct and proximate result thereof?

The Court is of the opinion and finds that the preponderance of the evidence showed that the defendant Murphy breached an implied warranty of merchantability in the sale of these elevators; that said elevators were not suitable for the purpose for which they were to be used and as a direct and proximate result thereof plaintiff sustained damages.

(3) Is plaintiff barred from recovery by reason of the alleged misuse of the elevators?

The answer is No.

(4) Did plaintiff assume the risk of any defect in the elevators?

The answer again is No.

(5) If defendant Murphy is liable to plaintiff is defendant entitled to recover from Rockwell the amount of the loss or any part thereof; if so, what is the amount?

The answer to this question is Yes. In the opinion of the Court, and the Court finds, that Murphy is entitled to recover one-half of the damages assessed against Murphy because Rockwell breached an

implied warranty to Murphy when they sold the elevator parts to Murphy.

(6) The defendant Murphy claims that it is entitled to disclaim any liability that allegedly occurred more than one year after the date of contract.

The written contract entered into between Murphy and Curtis contained the following provision:

"All warranties, express, implied and statutory, shall terminate upon final acceptance of the work covered by this contract except that we agree to replace f. o. b. our plant any defective materials not due to ordinary wear and tear or improper use which may develop within one year from date of said final acceptance."

In the opinion of the Court this is not an adequate disclaimer under T.C.A. § 47–2–316.

## II. SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the conclusion of the Memorandum delivered from the bench, the parties were advised that the question of the amount of damages would be taken under advisement and that a Supplemental Memorandum would be prepared and filed with the Clerk. Since that time the Court has considered the record in depth and makes the following supplemental findings of fact and conclusions of law:

### 1. Statutes of Limitation

On May 20, 1971, the Murphy Elevator Company [Murphy] contracted with Howell C. Curtis to install two elevators in the Arnstein Building, a seven-story office building located in Knoxville, Tennessee. The front or east elevator was accepted by Curtis on December 10, 1971, and the rear or west elevator was accepted by Curtis on June 6, 1972. This action was filed September 12, 1975.

The Tennessee commercial law provides its own statute of limitations, and the period specified therein is applied in cases involving an alleged breach of warranty in a contract for sale. *Layman v. Keller Ladders, Inc.*, 224 Tenn. 396, 455 S.W.2d 594 (1970). The statute of limitations is set out in T.C.A. § 47–2–725 and provides, in pertinent part, as follows:

"(1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one (1) year but may not extend it.

"(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

\* \* \* \* \*

"(4) This section does not alter the law on tolling of the statute of limitations . . ."

Thus, actions based on breach of warranty must be brought within four years after tender of delivery is made unless one of the exceptions provided in the statute applies. *See McCroskey v. Bryant Air Conditioning Company*, 524 S.W.2d 487, 491–92 (Tenn.1975). We must therefore determine when tender of delivery was made under the facts of this case in order to determine when the statute of limitations accrued.

Murphy contracted to furnish and install the elevators in question. The contract provides that "[a]ll materials covered by this contract shall belong to and be the sole property of the Murphy Elevator Company until the purchase price is paid in full . . ." Installation was complete and the front and rear elevators were accepted by Curtis on December 10, 1971 and June 6, 1972, respec-

tively. On these facts, tender of delivery was made in Knoxville on these latter two dates. *See Mid-South Milling Co., Inc. v. Loret Farms, Inc.*, 521 S.W.2d 586 (Tenn.1975); *Cumberland Corp. v. E. I. Dupont de Nemours and Co.*, 383 F.Supp. 595 (E.D.Tenn.1973). Although it was stated in *Bates v. Shapard*, 224 Tenn. 672, 461 S.W.2d 946 (1970) that "plaintiff had four years from the date of sale" to bring a warranty action, we do not think that this means four years from the date the contract to purchase goods is executed. In *McCroskey v. Bryant Air Conditioning Co., supra*, the Court considered the date of sale of a defective furnace as being the date the furnace was "distributed and installed." 524 S.W.2d at 488. No mention was made of the date plaintiff contracted to purchase the furnace.

Accordingly, we conclude that with regard to the warranty action, the statute of limitations accrued on the dates that plaintiff accepted the elevators for service, and since the present action was filed within four years of those dates the warranty action is not barred. See also, D. Noel & J. Phillips, *Products Liability in a Nutshell*, at 328 (1974).

■ We do conclude, however, that the action against both defendants for tortious misrepresentation and negligence is barred by the three-year statute of limitations.[1] The Tennessee Supreme Court has recently held that in tort actions

"the cause of action accrues and the statute of limitations commences to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should

have been discovered. All cases contra are overruled." *McCroskey v. Bryant Air Conditioning Co., supra*, at 491.

An exhibit offered by the plaintiff shows that plaintiff and his agent were aware of difficulties with the elevators as early as July or August 1972. Exhibit 2. We conclude that plaintiff discovered the defects in the elevators more than three years prior to filing this suit and that the negligence and misrepresentation claims are therefore barred.

■ Plaintiff contends that the statute of limitations was tolled because Murphy represented to it that the problems could be repaired. The proof showed, however, that after plaintiff met with officials of Murphy and others in December 1972 concerning difficulties with the elevators, it was not until the summer of 1975 that officials of Murphy were again contacted about further difficulties. Under these and other circumstances in the record and the applicable case law, the three-year statute of limitations was not tolled. *See Benco Plastics, Inc. v. Westinghouse Electric Corporation*, 387 F.Supp. 772, 782–83 (E.D. Tenn.1974) and cases cited therein.

### 2. Breach of Warranty

Plaintiff negotiated with several elevator companies in 1971 with regard to installation of two automatic elevators in the Arnstein Building. Plaintiff owns the building and desired the new elevators for the use of his tenant, Tennessee Valley Authority.[2] The Murphy bid was accepted by plaintiff primarily on representations by Murphy that the "AC variable speed static drive" elevator developed by the Fincor Division of Rockwell

---

1. T.C.A. § 28–305 provides a three-year statute of limitations for tortious injury to property. This statute would apply to the negligence and misrepresentation claims. *Benco Plastics, Inc. v. Westinghouse Electric Corp.*, 387 F.Supp. 772 (E.D.Tenn.1974); *Layman v. Keller Ladders, Inc.*, 224 Tenn. 396, 455 S.W.2d 594 (1970).

2. T.V.A. had occupied the building since 1959. In a supplemental lease agreement entered

into in July 1971, plaintiff agreed to remove the two manually operated elevators and replace them with automatic elevators. T.V.A. agreed to pay plaintiff an additional $20,000.00 per year in rent after the elevators were installed and accepted by T.V.A. and to pay that additional rent until August 31, 1975. T.V.A. paid plaintiff some $70,000.00 in additional rent under the terms of the supplemental lease agreement.

was a "revolutionary breakthrough in the elevator field." [3]

The other type of elevator available to plaintiff was the DC (direct current) drive elevator which was in more common usage. Murphy offered the DC-type elevator to plaintiff at the same price it offered the AC (alternating current) type. [4]

The AC-type system was represented to plaintiff as being superior because, *inter alia*, it virtually eliminated moving parts normally associated with DC control systems and provided a tightly regulated closed loop system.

Shortly after the elevators were installed many complaints were received by T.V.A. concerning erratic operation. An informal log of these complaints was kept by employees of T.V.A. during the period of August 1972 until August 1973 and it contains about 85 complaints pertaining to the elevators. Exhibit 13. This record was not received as substantive evidence of the matters stated therein, but the facts proven at trial are entirely consistent with the malfunctions described in the informal record. Furthermore, defendants relied on certain of the complaints listed in the informal record in an effort to show that the problems stemmed from lack of maintenance and improper operation by passengers.

Joe Lane, a T.V.A. employee who rode the elevators regularly during the period in question, testified that the elevators usually did not come to rest flush with the floor and that the elevators operated with a "yo-yo" effect while descending. In July 1975, Lane was riding the rear elevator when it passed the top floor and seemed to crash into the overhead of the elevator shaft. [5]

Howard Vickers, the elevator repairman under contract with T.V.A. to maintain the elevators and a sales representative of Murphy, and a State elevator inspector also took a similar uncontrolled "ride" on the rear elevator shortly after it was installed. Several other similar incidents occurred during the period in question.

Vickers installed the elevators under the supervision of a representative of Murphy, W. C. Major, and did most, if not all, of the maintenance and repair work on the elevators. He has about thirty years' experience with sales, service and installation of elevators. He testified that the elevators do not always come to rest flush with the floor and that this variance was in the neighborhood of $0''$ to $6''$. On cross-examination, he stated that the variance was in the area of $1''$. The contract calls for leveling accuracy "within ¼ of exact floor level under all conditions of load." We are of the opinion that it does not matter whether the elevators level to $\pm 6''$ or $\pm 1''$, both figures are outside the contract specifications. Furthermore, it stands to reason that a $1''$ variance might be more dangerous to a passenger moving in or out of the elevator than a more obvious $6''$ variance since the smaller variance might go unnoticed until a passenger stumbles over the obstruction.

---

**3.** Among the features advertised as revolutionary were the new system's efficiency, stepless acceleration and deceleration, leveling accuracy, reliability and reduced maintenance costs. Exhibit 1, p. 4.

**4.** Reduced to its simplest terms, the basic difference between the DC-type and AC-type elevator is that the former utilizes a motor generator set to convert alternating current to direct current, and direct current then supplies power to a DC controller which operates the DC hoist motor which, in turn, moves the elevator. The AC-type elevator is moved by an AC hoist motor which is controlled by solid state circuitry that regulates three-phase AC current so as to change hoist motor speed and direction.

**5.** Apparently what actually happened was that due to some failure in the control system the elevator traveled too far upwards in the shaft and the counterweights slammed into the floor of the basement. The momentary slackening of the elevator lifting cables as the elevator's momentum carried it upward resulted in a jolt when the elevator settled to a level where the cables were again supporting the weight of the elevator cab.

Vickers also testified that both elevators were installed with releveling devices,[6] but these devices had to be disconnected because they were not compatible with the AC-type elevator, despite the efforts of defendants to correct the situation. Vickers further testified that without the releveling devices the elevators are unsafe and that the only plausible remedy is to convert the elevators to DC types which could be fitted with releveling devices.

The evidence also showed that the elevators would not operate properly at the speed specified in the contract (350 feet per minute), and that, even with the speed reduced to 290 feet per minute, operation was erratic. The elevators also developed serious problems with the braking system and the automatic door opening and closing system. In addition to the witnesses previously mentioned, several other witnesses testified that the elevators did not level properly, failed to proceed to the proper floors and operated with strange noises and vibration.

 In the opinion of the Court the preponderance of the evidence shows that the elevators were defective because of inadequate design and improper component parts and that the defective design and component parts rendered the elevators unsatisfactory and dangerous for passenger use. The elevators were materially defective at the time of delivery and were unfit for the ordinary purposes for which they are normally used. T.C.A. § 47–2–314.[7]

The defendants' contentions that the elevators are no worse than any other elevators in service and that most of the trouble was due to improper maintenance and failure of T.V.A. employees to operate the elevators properly cannot be accepted. The proof shows that problems with the elevators developed shortly after installation—at a time when want of proper maintenance would seemingly be of little consequence. Furthermore, the maintenance was done by a repairman, Vickers, with long experience in elevators and who represented Murphy in this area.

With regard to the allegations that the elevators were not operated properly, it should be noted that the elevators were designed to operate automatically, presumably by any person of ordinary intelligence who wished to use them. Furthermore, even Vickers often had trouble making the elevators operate properly.

 Murphy's contention that it disclaimed all implied warranties is without merit. The contract provision relied upon is set out above in the bench memorandum. Normally, a valid disclaimer of the implied warranty of merchantability must mention "merchantability" and in the case of a writing must be conspicuous. T.C.A. § 47–2–316(2). The exceptions to this rule set out in paragraph (3) of the statute have no application under the facts of this case. The attempted disclaimer is insufficient to exclude the implied warranty of merchantability. See *Cooper Paintings & Coatings, Inc. v. SCM Corporation*, 62 Tenn.App. 13, 457 S.W.2d 864 (1970); 2 L. Frumer and M. Friedman, *Products Liability* § 19.07[6] (1974). Furthermore, if the clause were construed as an attempt to shorten the statute of limitations for an implied warranty action to less than one year, such a limitation would be invalid. T.C.A. § 47–2–725.

 The disclaimer provision in the contract also contains a limited one-

---

**6.** The releveling devices were manufactured by Rockwell and were designed to relevel the elevator to within ¼″ of the outside floor should the elevator stop outside this band of tolerance.

**7.** "47–2–314. *Implied Warranty—Merchantability—Usage of trade*—(1) Unless excluded or modified (§ 47–2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . .

"(2) Goods to be merchantable must be at least such as

\* \* \* \* \* \*

"(c) are fit for the ordinary purposes for which such goods are used . . . . "

year parts-replacement warranty. We do not construe this agreement as describing the sole remedy under the contract. Such clauses are presumptively cumulative rather than exclusive and in order for these clauses to be construed as the sole remedy under the contract this intention must be clearly expressed by the parties to the contract. T.C.A. § 47–2–719(1)(b) and Comment 2.

The evidence does not support defendants' contention that plaintiff or his agents or representatives misused the elevators, nor does the evidence support the contention that plaintiff assumed the risks of defects after he had accepted the elevators. The loss sustained in this case does not stem from conduct of the plaintiff, his agents or representatives, rather it was the direct and proximate result of the sale of defective elevators to plaintiff. See T.C.A. § 47–2–314, Comment 13; J. White & R. Summers, *Uniform Commercial Code* § 11–7 (1972).

### 3. Damages

The normal measure of damages in a breach of warranty action is set out in T.C.A. § 47–2–714(2), which provides as follows:

"The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

The cost of repairing the elevators serves as a useful measurement of the difference in value as is and as warranted. J. White & R. Summers, *Uniform Commercial Code* § 10–2 (1972). This is an appropriate measure of damages in this case since the proof showed that the elevators can be made to function satisfactorily if they are converted to DC-type elevators. This measure of damages will serve to make plaintiff whole because, as was testified by his rental agent, prospective tenants will almost certainly demand that the elevators be put into a safe and working condition before the building can be leased in the future.

Vickers, the repairman who worked on the elevators in question and who also represented Murphy in this area from time to time, testified that in his opinion the cost of converting the system would be $50,000.00. Two witnesses for Murphy testified that the cost of conversion was in the neighborhood of $7,000.00 to $8,000.00. We must determine the fair compensation due plaintiff, and in doing so, we are not bound to accept the exact amount proposed in the testimony of a particular witness. *Ford Motor Co. v. Taylor*, 60 Tenn.App. 271, 446 S.W.2d 521, 530 (1969).

We are of the opinion that the figure given by Vickers is on the high side and the figures given by the Murphy representatives are on the low side. In looking at the overall proof, we are of the opinion that $40,000.00 would be adequate and fix the damages at that sum. This figure includes the cost of converting the elevators to DC-types and includes $2369.00 that plaintiff has already spent trying to repair the defective elevators and $3,050.00 that T.V.A. withheld in rent, which it apparently expended trying to repair the elevators. Exhibits 3, 4, 5. Murphy is liable for breach of implied warranty in the amount of the total damages plaintiff has sustained even though it may not have had an opportunity to inspect all of the defective component parts supplied by Rockwell before they were incorporated into the finished product. *See Walker v. Decora*, 225 Tenn. 504, 471 S.W.2d 778 (1971).

The $40,000.00 figure does not include, however, consequential damages. The evidence was insufficient to show that plaintiff had suffered any consequential damages. Furthermore, the contract between plaintiff and Murphy expressly

excluded such damages. T.C.A. § 47–2–719(3).[8]

### 4. Plaintiff's Action against Rockwell

For the reasons discussed previously, the three-year statute of limitations bars plaintiff's recovery against Rockwell on the theory of negligence or misrepresentation. We note in passing that there was no evidence that agents of Rockwell misrepresented anything to plaintiff about the product prior to time of purchase.

██ The warranty claim by plaintiff against Rockwell must be dismissed because there is no privity of contract between plaintiff and Rockwell. *Hargrove v. Newsome*, 225 Tenn. 462, 470 S.W.2d 348 (1971); *Ford Motor Company v. Taylor*, 60 Tenn.App. 271, 446 S.W.2d 521 (1969). We are of the opinion that T.C.A. § 23–3004 (Supp.1974) has not abolished the privity requirement in warranty actions between business entities seeking recovery for commercial losses.[9] *See Walker's Truck Contractors, Inc. v. Crane Carrier Co.*, 405 F.Supp. 911 (E.D. Tenn., Supplemental Memorandum filed August 5, 1975); Speidel, *Products Liability, Economic Loss and the UCC*, 40 Tenn.L.Rev. 309 (1973). Accordingly, plaintiff's action against Rockwell is dismissed.

### 5. The Cross-Claim

██ Murphy cross-claims against Rockwell seeking reimbursement for the entire amount of the judgment rendered against it. Rule 13(g), F.R.C.P. The proof does not support a complete shifting of the burden in damages to Rockwell. Both Murphy and Rockwell were responsible for the defective condition of the elevators. For example, the defective braking devices and automatic door

system were supplied by Murphy, but the defective AC variable speed static drive system and releveling devices were supplied by the Fincor Division of Rockwell.

A preponderance of the evidence showed that the above-mentioned component parts supplied by Rockwell were not of merchantable quality and as a direct and proximate result of their defective nature the elevators operate erratically and are not safe for passenger use.

██ Accordingly, Murphy is not entitled to recovery for the full amount of the judgment against it, but rather it is entitled to judgment against Rockwell in the amount that the defective products supplied by Rockwell contributed to the overall defectiveness of the product. Considering all of the evidence, we conclude that this amount is $20,000.00, or one-half the judgment entered against Murphy.

It may be appropriate to point out at this time, without intending to reflect on counsel in this case, that a custom has developed in this area in products liability cases of routinely alleging multiple claims, including negligence, breach of express and implied warranties, strict tort and misrepresentation. This requires the Court to discuss the applicability or nonapplicability of these claims when, in most instances, only one or two valid claims or causes of action exist. Often no evidence is introduced in support of one or more of the multiple claims. If it were possible for plaintiffs, after careful consideration, to decide the appropriate basis or bases of recovery and then plead and present the case in a concise and organized manner, it would shorten the trial and otherwise materially lessen the work of the Court.

Order accordingly.

---

**8.** T.C.A. § 47–2–719(3) provides, in pertinent part: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."

**9.** T.C.A. § 23–3004 provides: "In all causes of action for *personal injury* or *property damage*

brought on account of negligence, strict liability or breach of warranty, including actions brought under the provisions of the Uniform Commercial Code, privity shall not be a requirement to maintain said action." (Emphasis added).