IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 13, 2018 Session

## J.W. SMITH, ET AL. v. TIMBERPRO INC., ET AL.

**Appeal from the Circuit Court for Carroll County**
**No. 13-CV-76        Donald E. Parish, Judge**

_____

### No. W2018-00878-COA-R3-CV

_____

This is the second appeal of this case, which involves the destruction of a TimberPro TL735B harvester by electrical fire. In the first appeal, we affirmed the grant of summary judgment for all claims against the defendants except for claims of the breach of the implied warranties of merchantability and fitness against appellee, Woodland Equipment, Inc. ("Woodland"). After the first appeal, the trial court found that Woodland breached the implied warranty of merchantability with respect to the protective plastic covering used to cover the wires that caused the electrical fire. Nonetheless, the trial court did not hold Woodland liable, finding appellant, J.W. Smith, leaving the master switch "on" was the "last precipitating cause" of the fire. The court also determined that if an appellate court was to reverse its findings, the damages Smith would be entitled to would be $330,000 for the harvester, which was determined by subtracting the salvage value of the harvester ($45,000) from the value of the harvester before the fire ($375,000). We conclude that Smith's failure to turn "off" the master switch was not an intervening cause, and the evidence does not preponderate against the trial court's prospective award of damages. We affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in
Part, Reversed in Part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

W. Timothy Harvey and Rebecca J. Garman, Clarksville, Tennessee, for the appellant, J. W. Smith.

Kenneth R. Shuttleworth, Robert W. Briley, and Michelle Handelsman, Nashville,

Tennessee, for the appellee, Woodland Equipment, Inc.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

The underlying facts and procedural history of this dispute were set forth in this Court's opinion from the first appeal (with original footnotes):

[J.W. Smith d/b/a J.W. Smith Logging ("Smith")] owns and operates a logging business based in Tennessee Ridge, Tennessee. In 2010, Smith decided to purchase a commercial harvester designed and manufactured by TimberPro, Inc. ("TimberPro"). Smith contacted [Don Bush d/b/a Bush Forestry Equipment ("Bush")], a Tennessee TimberPro dealer, about purchasing a TimberPro harvester equipped with a Risley harvesting head. Bush referred Smith to [Woodland Equipment, Inc. ("Woodland")], a Michigan TimberPro dealer, because he believed that Woodland would be better-suited to installing the harvesting head.

In April 2010, Smith and Woodland entered into a written contract, titled "Sales Order," for the sale of a TimberPro TL735B harvester equipped with a Risley Rolly II harvesting head. The Sales Order reflects Smith's agreement to pay Woodland $481,000 for the harvester, states that it constitutes the entire contract between Woodland and Smith, and includes the following reference to a TimberPro warranty policy:



The harvester was delivered to Smith in June 2010. Bush met with Smith when the harvester was delivered, ostensibly to help familiarize him with the harvester. During the meeting, Smith signed a document, titled "Delivery Report," which stated in part, "Having read the TimberPro Warranty Policy . . . I now have a working knowledge of [the harvester]."

The TimberPro warranty policy referenced in the Sales Order and Delivery Report states:

1. Product Warranty. Subject to the terms and conditions of this limited warranty, Timberpro, Inc. ("Timberpro") warrants to the original Purchaser only of 725 & 735 Series Machines that under normal use and

conditions the machines will be free from defect in material and workmanship when used for their intended purpose for a period of one (1) year-from delivery to the Purchaser or 2000 machine hours, whichever occurs first.

. . .

**THIS LIMITED WARRANTY AND THE REMEDIES DESCRIBED HEREIN ARE PURCHASER'S SOLE AND EXCLUSIVE REMEDY, AND ARE OFFERED BY TIMBERPRO IN LIEU OF ALL OTHER WARRANTIES, GUARANTEES, AND/OR REMEDIES WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE UNDER THE UNIFORM COMMERCIAL CODE, OR OTHER WARRANTIES OR GUARANTEES ARISING BY OPERATION OF LAW, ALL OF WHICH ARE HEREBY EXPRESSLY DISCLAIMED.**

In May 2013, the harvester was destroyed by a fire. In December 2013, Smith filed a complaint against Bush in the Carroll County Circuit Court in which he alleged that the fire was caused by a defect in the harvester's electrical system.[1] Later, Smith amended the complaint to include Woodland as a defendant. As amended, Smith's complaint alleged that Bush and Woodland were liable for, among other things, breach of contract, breach of express warranties, and breach of the implied warranties of merchantability and fitness.[2]

In December 2015, Woodland and Bush filed motions for summary judgment on Smith's contract and warranty claims. In their motions and supporting documents, Woodland and Bush asserted that Smith was bound by the terms of the TimberPro warranty policy, which provided a one-year limited warranty on the harvester and disclaimed all other warranties, including the implied warranties of merchantability and fitness. They

---

[1] Although Smith's complaint also named TimberPro as a defendant, the trial court granted summary judgment to TimberPro on all of Smith's claims, and Smith does not challenge the trial court's ruling with regard to TimberPro on appeal.

[2] Smith's complaint also asserted tort, products liability, and consumer protection claims against Bush and Woodland. In September 2015, the trial court granted summary judgment in favor of Bush and Woodland on those claims. Smith does not challenge the trial court's ruling with regard to those claims on appeal.

argued that the trial court should dismiss Smith's warranty claims because the only warranty on the harvester (the one-year limited warranty in the TimberPro warranty policy) expired before the fire that destroyed the harvester. Additionally, they argued that the trial court should dismiss Smith's contract claim because Smith failed to allege or demonstrate any other basis for a breach of contract. Alternatively, Bush also argued that Smith's warranty and contract claims against him should be dismissed because he was not in contractual privity with Smith.

In response, Smith argued that he was not bound by the TimberPro warranty policy because he did not receive a copy of it when he purchased the harvester. Additionally, Smith asserted that Woodland and/or Bush expressly warranted to him prior to the sale that the harvester would be "free from defects" and that "they would stand by their machines." He argued that the harvester's defective electrical system constituted a breach of that express warranty, a breach of the implied warranties of merchantability and fitness, and a breach of contract. Finally, Smith argued that there was a factual dispute as to whether Bush was a joint-seller of the harvester and therefore in contractual privity with Smith.

In March 2016, the trial court entered an order granting summary judgment in favor of Woodland and Bush. In relevant part, the trial court's order states:

> More specifically, with regards to Bush, based on the undisputed material facts, this Court finds that there is no contract between Bush and Plaintiff. Therefore, no claim for breach of contract or breach of warranty exists.
>
> With regards to Woodland, based on the undisputed material facts, Plaintiff has failed to show Woodland breached the Sales Contract with Plaintiff. Plaintiff has also failed to show Woodland made or breached any warranties to Plaintiff.
>
> The Court finds it is uncontradicted that any express warranty by the manufacturer, Timberpro, Inc., had long expired prior to the loss and all implied warranties, if any, were conspicuously waived. This Court finds that Plaintiff had the opportunity to, and did see and look at, the warranty. However, if Plaintiff did not, Plaintiff at a minimum had the opportunity to do so. Plaintiff cannot come back years later and assert there are implied warranties when he so plainly waived them years

4

earlier.

*Smith v. TimberPro Inc.* ("*Smith I*"), No. W2016–00757–COA–R3–CV, 2017 WL 943317, at *1-2 (Tenn. Ct. App. Mar. 9, 2017).

On appeal, Smith raised five separate issues:

1. Whether the trial court erred in granting summary judgment in favor of the defendants on Smith's claim for breach of express warranty.

2. Whether the trial court erred in granting summary judgment in favor of the defendants on Smith's claims for breach of the implied warranties of merchantability and fitness.

3. Whether the trial court erred in granting summary judgment in favor of the defendants on Smith's claim for breach of contract.

4. Whether the trial court erred in holding that there was no contractual privity between Bush and Smith.

5. Whether the trial court erred in holding that Smith was bound by the TimberPro warranty policy after holding that there was no contractual privity between TimberPro and Smith.

*Id.* at *2. The *Smith I* court affirmed the trial court's grant of summary judgment for all of Smith's claims except for Smith's implied warranties of merchantability and fitness claims against Woodland. *Id.* at *3, 5. The trial court found that "Woodland . . . conspicuously disclaimed any implied warranties in the TimberPro warranty policy." *Id.* at *4. However, this Court disagreed, reasoning that the "mere reference" to the TimberPro warranty in the Sales Order is not sufficient to disclaim an implied warranty. *Id.* Moreover, the court also stated that the evidence did not show that Smith "receive[d] a copy of the TimberPro warranty policy at the time of the sale." *Id.* As a result, the court in *Smith I* "reverse[d] the trial court's grant of summary judgment to Woodland on Smith's claim for breach of the implied warranties of merchantability and fitness." *Id.*

On remand, the trial court conducted a bench trial to consider whether there was a breach of the implied warranties of merchantability and fitness. At trial, Smith's expert testified that, in his expert opinion, the fire was caused due to wires in the main electrical box rubbing through the protective plastic collar used as insulation, causing the wires to short. He explained:

[T]here's numerous wires going through that hole [in the main electrical

5

box] that are on all the time the box is turned on. When [the master switch] is on . . . those wires are powered up. They supply power to . . .

Well, the box itself supplies power to the engine, to the cab, to the controls, to the computers, heaters, whatever.

The wires going through that hole were energized and they just— basically, there are other pictures that show it just was just wires with insulation on them run through a hole inside of a sheet metal box and there's a . . . it's not a grommet. It's more of just a cover around the edge of the hole, plastic cover.

And this machine bounces and bangs. It's in the dirt. And if this has gone on for three years, and one of those wires rubbed through and shorted out, starting the fire or went through that metal hole.

Smith's expert testified that the thin plastic collar constituted a defect due to the inadequate protection and higher risk of fire. Instead of using a plastic collar, he stated that a rubber grommet[3] or a box connector[4] was needed in order to adequately protect against a potential fire. Smith's expert also ruled out other potential causes of the fire such as lightning.[5]

Smith and his son, who operated the harvester, both testified that the harvester's master switch was left in the "on" position when the fire occurred even though the harvester was not in operation at the time. Because the harvester's master switch remained in the "on" position, according to Smith's expert, electricity ran through the wires, allowing the fire to start when the wires shorted. Had the machine been turned "off," the fire would not have started at that time. However, Smith's expert testified that wires would have shorted "[v]ery possibly the next time . . . the machine [was] on, especially if it started moving around [] the[] wires, the short would have occurred then." According to Smith and his son's testimony, the switch was left "on" because they believed doing so was necessary in order to ensure electrical supply to the fire suppression system. However, according to Smith's expert, the fire suppression system would have power regardless of whether the master switch remained "on." Also, the switch was left in the "on" position despite a warning label on the harvester and in the user manual advising users to turn the switch to "off" when the harvester was left unattended.[6]

---

[3] A grommet would be around 3/4 of an inch thick, while the plastic collar was, at most, 1/8 of an inch thick.

[4] The purpose of the box connector is to keep the wires "rigidly fixed inside" the electrical box, preventing the wires from rubbing together.

[5] Woodland's expert disagreed with Smith's expert. He stated that the fire had an "undetermined cause and origin" and did not originate in the electrical box.

[6] The warning label was located over the cover of the master switch and stated: "MASTER

Bush, a TimberPro dealer, also testified that the master switches were often left "on" with TimberPro equipment at his dealership. While he admitted "it would be better" if the switch was "off," he did not see leaving the switch in the "on" position as a potential hazard.

After trial, the trial court held that Woodland breached the implied warranty of merchantability.[7] Specifically, the court, relying on Smith's expert, found that the harvester was defective because the wires in the main electrical box lacked rubber grommets or a box connector where the wires passed through the electrical box, which was needed to prevent the wires from contacting the metal box. Instead, only the plastic collar served to prevent the wires from rubbing against the electrical box. The court stated:

> It was foreseeable that given the vibration of the timber harvester during normal use over . . . time that the insulation covering the wires themselves could be worn and that the plastic collar could be dislodged, resulting in the exposure of the bare wire within to the metal electrical box. It was also foreseeable that this exposure would then result in an . . . electrical short and pose a serious fire hazard.

However, despite finding that Woodland had breached the implied warranty of merchantability, the court found that Woodland was not liable to Smith, as Smith leaving the master switch "on" was the "last precipitating cause" of the fire. If Smith had turned off the machine, the trial court reasoned, the wires would not have been "hot;" therefore, the fire would not have started. Moreover, the court found that Smith was aware that the machine should be turned off when not in use because there was a warning label affixed to the machine and the owner's manual also warned that the machine should be turned off when not in use. The court also stated it could not speculate as to whether the harvester would have caught fire later when the machine was in operation.

After finding Woodland not liable, the court further decided the amount of damages that would be awarded to Smith if this Court was to reverse the trial court's decision. Smith testified the harvester was worth between $431,000 to $450,000 before

---

ELECTRICAL DISCONNECT (under this cover)[.] Turn "OFF" when leaving machine unattended." Under the "Machine Fire Prevention" section of the user's manual, the manual warned for the harvester user to "[a]lways shut down the engine and turn off the electrical master disconnect if leaving the machine unattended. Never leave the machine running when unattended and you are out of site [sic] of the machine."

[7] While the trial court found that the implied warranty of merchantability was breached, the court rejected that the implied warranty of fitness for a particular purpose was breached, as "[t]he timber harvester was not designed for any significant particular purpose beyond its general purpose."

the fire, while the owner of Woodland, Ron Beauchamp, testified that the harvester was worth between $350,000 and $375,000. Smith further testified that he sold the salvage of the burned harvester for $45,000. The court found the damages for the destruction of the harvester to be $330,000. The trial court determined this figure by subtracting the salvage value of the harvester ($45,000) from the value of the harvester before the fire ($375,000). Smith filed a timely notice of appeal.

## II. ISSUES PRESENTED

Smith presents the following issues on appeal:

1. Whether the Trial Court erred in holding Smith is not entitled to recovery because the master switch in the "on" position was the "last precipitating cause" of the fire; and

2. Whether the Trial Court erred in relying on the testimony of Beauchamp, who based his valuation on statistical depreciation rather than the owner's testimony regarding the value of the harvester prior to the fire loss in calculating the damages to the harvester.

## III. DISCUSSION

### A.

On appeal, Smith asserts that the trial court erred in determining that his failure to turn the master switch "off" was the "last precipitating cause" of the fire that destroyed the harvester. While the trial court determined that Woodland breached the implied warranty of merchantibility, the trial court also found that Smith leaving the master switch "on" constituted the "last precipitating cause" of the fire. The court noted that both Smith and his son, who operated the harvester, failed to heed the "clear operating instructions" located on the harvester itself and in the manual warning that the master switch should be turned "off" when the harvester is not in operation. There is no case law in Tennessee defining "last precipitating cause." While the trial court described leaving the master switch "on" as the "last precipitating cause," the court's reasoning is more akin to a proximate cause analysis. This inapplicable terminology is understandable considering the paucity of Tennessee case law detailing what is required to prove liability for breach of the implied warranty of merchantability.

In order to prevail on an action for breach of warranty, a plaintiff must "show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained." Tenn. Code Ann. § 47-2-314 comment 13. *See Chisholm v. J.R. Simplot Co.*, 495 P.2d 1113, 1117 (Idaho

8

1972) ("In an action based on breach of warranty, it is necessary to show that the breach of the warranty was the proximate cause of the loss sustained."). *See also Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 839-40 (1996) ("Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well."). Proximate cause is a question of fact. *King v. Anderson Cty.,* 419 S.W.3d 232, 245 (Tenn. 2013). In cases tried without a jury, we review findings of fact by the trial court de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Jones v. Bradley Cty.*, No. E2015–00204–COA–R3–CV, 2016 WL 197324, at *2 (Tenn. Ct. App. Jan. 15, 2016).

Courts employ various theories of causation in order to determine whether proximate cause exists. *See, e.g.*, *Drayton v. Jiffee Chem. Corp.,* 591 F.2d 352, 359-61 (6th Cir. 1978) (applying the doctrine of intervening cause to a breach of warranty claim); *Blim v. Newbury Indus., Inc.,* 443 F.2d 1126, 1128 (10th Cir. 1971) (applying the doctrine of intervening cause to an implied warranty claim); *Wyatt v. Winnebago Indus., Inc.,* 566 S.W.2d 276, 281 (Tenn. Ct. App. 1977) (discussing different tests used by Tennessee courts to determine proximate cause, including a "but for" proximate cause analysis, the "substantial factor" test, and the doctrine of "intervening cause."); Steven W. Feldman, 22 Tenn. Prac. Contract Law and Practice § 12:12 (June 2018) ("In determining whether the defendant's conduct has caused a breach, courts have applied both a more lenient "substantial factor" analysis along with a stricter "but for" theory. The selection of the appropriate causation standard depends on the facts of the case and lies largely within the trial court's discretion."). We will use an intervening cause analysis to determine proximate cause, which most closely approximates the reasoning of the trial court.[8]

An intervening or superseding cause "is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Dunnivant v. Nafe,* 334 S.W.2d 717, 719 (Tenn. 1960) (quoting Restatement (Second) of Torts, § 440) (internal quotation marks omitted). The doctrine of intervening cause only applies where the intervening act "(1) was sufficient by itself to cause the injury, (2) was not reasonably foreseeable to the negligent actor, and (3) was not a normal response to the negligent actor's conduct." *Potter v. Ford Motor Co.,* 213 S.W.3d 264, 273 (Tenn. Ct. App. 2006) (quoting *Rains v. Bend of the River,* 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003))

---

[8] The application of the doctrine of intervening cause to the present case is hardly novel, as several jurisdictions have applied the doctrine to warranty cases. *See Drayton,* 591 F.2d at 359-61; *Blim,* 443 F.2d at 1128; *Bryant v. Sears, Roebuck & Co.,* 435 F.2d 953, 956-57 (4th Cir. 1970).

(internal quotation marks omitted). "An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated." *Evridge v. American Honda Motor Co.,* 685 S.W.2d 632, 635 (Tenn. 1985).

Here, it is clear that the negligent intervening act (leaving the master switch "on") was not sufficient by itself to cause the injury. The trial court found the testimony of Smith's expert to be credible, and that expert testified that if a rubber grommet or box connector was used to protect the wires, there would have been minimal to no risk of an electrical fire. Therefore, solely leaving the switch "on" without the initial breach of warranty would be insufficient to cause the fire.

Moreover, leaving the master switch "on" could be reasonably anticipated. Bush, a certified TimberPro dealer, testified that the master switch is often left "on" with harvesters in his inventory. Also, the potential for owners to not turn the master switch "off" was undoubtedly contemplated, as a warning to turn the switch to the "off" position was displayed on both the warning label and in the owner's manual.

In addition, the "last precipitating cause" language employed by the trial court implies that it was significant that leaving the switch "on" was the last act that caused the fire. However, there is no requirement under Tennessee law that a cause is "the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result[]" in order to establish proximate cause. *McClenahan v. Cooley,* 806 S.W.2d 767, 775 (Tenn. 1991). The breach of warranty was a substantial factor in the fire that destroyed the harvester regardless of it occurring before Smith's most recent act of leaving "on" the switch. Because leaving the master switch "on" was not sufficient by itself to cause the fire, leaving the switch "on" was reasonably foreseeable, and the breach of warranty was a substantial factor in the fire, the breach of warranty was the proximate cause of the loss.

Even where proximate cause is established, a seller may raise as a defense "that the loss resulted from some action or event following his own delivery of the goods." Tenn. Code Ann § 47-2-314, comment 13. The comment does not specify what actions or events would constitute such a defense; however, misuse may constitute a defense to a breach of implied warranty of merchantability claim. *See Curtis v. Murphy Elevator Co.,* 407 F.Supp. 940, 943 (E.D. Tenn. 1976).

The 1st Circuit in *Cigna Insurance Co. v. Oy Saunatec, Ltd.* succinctly summarized the two types of misuse: foreseeable misuse and unforeseeable misuse. *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 16-17 (1st Cir. 2001). Because we have already concluded that leaving the switch "on" was foreseeable, unforeseeable misuse is not an applicable defense. Regarding foreseeable misuse, the court in *Cigna* stated the

following:

> [I]n a breach of warranty action, a defendant can raise the unreasonable use defense, arguing that though the plaintiff's use was foreseeable, "the plaintiff's unreasonable conduct in the face of a known defect was a breach of duty that caused the injury." [*Allen v. Chance Mfg. Co.,* 494 N.E.2d 1324, 1326-27 (Mass. 1986)] (noting that the unreasonable use defense arises only when there has been a foreseeable use of the product). To prevail on the unreasonable use defense, the defendant has the burden of proving that the plaintiff subjectively knew that the product was defective and dangerous, that, despite that subjective belief, the plaintiff's use of the product was objectively unreasonable, and that the plaintiff's conduct was a cause of the injury. See *id.* at 1326. If all the requirements of the defense are met, the plaintiff cannot recover for breach of warranty. . . .

*Id.* at 17. Woodland is unable to meet its burden of proof of showing a foreseeable but unreasonable use, as Smith was unaware of the defect in the harvester.

Because leaving the master switch "on" does not constitute an intervening cause and the foreseeable misuse defense is inapplicable, Woodland is liable to Smith, as the failure to use a rubber grommet or box connector is the proximate cause of the fire and resulting destruction of the harvester. Therefore, the judgment of the trial court is reversed with respect to causation.

### B.

Next, we address Smith's argument that the trial court erred in relying on Beauchamp's testimony concerning the value of the harvester rather than Smith's testimony. At trial, Smith testified that the harvester was worth between $431,000-$450,000, while Beauchamp testified that, in his opinion, the harvester was worth between $350,000 and $375,000. The trial court found that the harvester was worth $375,000 immediately before the fire, relying on Beauchamp's opinion of the harvester's value. On appeal, Smith argues that the trial court erred in relying on Beauchamp's testimony because, according to Smith, he "was in a much better position to know the value of the [] harvester" and "[n]early every witness acknowledged the machine was in very good condition with no maintenance issues prior to the fire loss."

For bench trials, the amount of damages awarded is a question of fact as long as the amount of damages is within the parameters of the law. *Memphis Light, Gas & Water Div. v. Starkey,* 244 S.W.3d 344, 352 (Tenn. Ct. App. 2007). "[W]e review the amount of damages awarded by the trial court with a presumption of correctness, unless the preponderance of the evidence demonstrates otherwise." *Id.* Where a damage award is

based on witness credibility, great weight is given to the findings "because the 'trial judge as the trier of fact had the opportunity to observe the manner and demeanor of all of the witnesses as they testified from the witness stand.'" *Id.* at 353 (quoting *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Here, the evidence does not preponderate against the court's findings regarding the value of the harvester. Moreover, we will not disturb the court's implicit findings as to the credibility of Beauchamp and Smith's testimony regarding the value of the harvester. Therefore, we affirm the decision of the trial court with respect to damages.

## IV. Conclusion

For the aforementioned reasons, the decision of the circuit court is hereby affirmed in part, reversed in part, and remanded. Costs of this appeal are taxed to the appellee, Woodland Equipment, Inc., for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE